BLH, INC.

v.

The UNITED STATES.

No. 433–81C.

United States Claims Court.

April 22, 1983.

---

C. Stanley Dees, Washington, D.C., for plaintiff. David A. Churchill and McKenna, Conner & Cuneo, Washington, D.C., of counsel.

Carmen M. Shepard, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. August V. Spallo, Asst. Dist. Counsel, U.S. Corps of Engineers, Washington, D.C., of counsel.

## OPINION

HARKINS, Judge.

The issue presented by cross-motions for summary judgment in this case is whether plaintiff's dissolution under Delaware corporation law on June 21, 1976, and the expiration of the statutory 3-year winding up period, eliminated plaintiff's capacity under USCCR 17(b) to sue or be sued on claims defined in a final decision of a contracting officer made July 15, 1980, pursuant to the disputes clause of a contract that was executed on April 15, 1968. For reasons that follow, plaintiff lacked the capacity to sue or be sued when the petition was filed in the United States Court of Claims on July 13, 1981, and on September 25, 1981, when defendant asserted a counterclaim. Accordingly, plaintiff's petition (now complaint) will be dismissed, and defendant's counterclaim will be dismissed without prejudice.

The following facts, applicable to the issue of plaintiff's capacity to sue or be sued, are not in dispute.

Plaintiff was incorporated on June 24, 1965, in the State of Delaware as Baldwin-Lima-Hamilton Corporation.[1] It manufactured heavy capital goods, including large hydraulic turbines to generate electric power. On April 15, 1968, Baldwin-Lima-Hamilton Corporation contracted with the Army Corps of Engineers (Contract No. DACW 41–68–C–0131) for the design, manufacture and delivery f.o.b. railroad cars at site, of six hydraulic pump-turbines for the Kaysinger Bluff Project (subsequently named the Harry S. Truman Dam and Reservoir Project) on the Osage River in Missouri. The contract price was $6,466,541.

On July 6, 1971, plaintiff's parent corporation publicly announced plaintiff's Industrial Equipment Division would be closed, and subsequently all of that Division's assets, real estate, machinery and product lines, were sold. The hydraulic turbine and valve product line were sold on October 20, 1971. On March 13, 1972, plaintiff notified the Corps of Engineers' Kansas City office that it would subcontract the domestic

---

1. The history of Baldwin-Lima-Hamilton Corporation dates back to the 1830's, and a predecessor company began manufacture of hydraulic turbines and valves prior to 1900. On May 1, 1972, the Certificate of Incorporation was amended to change the name to "BLH, Inc."

At the time the contract was entered, plaintiff was a wholly owned subsidiary of Armour & Company, Chicago, Illinois. After the contract was executed, Greyhound Corporation acquired Armour & Company.

manufacturing portion of the contract performed by the Industrial Equipment Division to Allis-Chalmers Corporation, York, Pennsylvania, and that all purchases from off-shore manufacturers would remain in effect as BLH subcontracts. On April 21, 1972, domestic manufacturing performance obligations under the contract, except design responsibility, performed by BLH, was subcontracted to Allis-Chalmers. The Industrial Equipment plant was closed on April 30, 1972, and all manufacturing operations ceased.

In June 1972, plaintiff conferred with the Kansas City District Corps of Engineers on a novation of its contract, to transfer completion from plaintiff to Allis-Chalmers. During this period, BLH executed three novation agreements with the Corps of Engineers with respect to other contracts. On November 22, 1972, plaintiff requested the Comptroller General for an opinion as to the legality of the proposed novation of this contract. In an opinion dated August 28, 1973, the Comptroller General ruled that the Corps of Engineers could recognize a novation if it determined it to be in the best interest of the Government. The decision noted that plaintiff's parent, Armour & Company, was not responsible for plaintiff's performance of the contract but under the proposed novation would act as guarantor.[2] The Corps of Engineers desired an extension of warranty conditions under the contract at no cost in exchange for the novation agreement. The parties were unable to agree to a contract novation.

Between January 1, 1975, and October 21, 1975, the pump-turbines manufactured under the contract were delivered to the project site. Pump-turbine units consist of several basic components, one of which is a steel vaned intake ring. The steel vaned intake rings were designed, manufactured, and delivered f.o.b. project site under plaintiff's contract. Installation of the vaned intake ring, and the other pump-turbine unit components, was performed by the erection contractor, Truman Powerhouse Contractors (TPC) under a separate prime contract with the Corps of Engineers. Plaintiff's contract included an obligation to provide the services of one or more engineers to supervise the work of the erecting contractor.

In April 1975, a problem surfaced that resulted in a dispute under the contract, which in correspondence between the parties is referred to as the "vaned intake ring problem." During installation of the vaned intake ring in Unit No. 5 of the powerhouse, it was observed that the anchor foundation concrete for the ring had cracked. TPC was instructed by the contracting officer, in April 1975, to suspend all work regarding torquing bolts, welding for vaned intake ring supports, and concrete placement in the vicinity of the vaned intake ring, pending investigation and correction of the problem.

On May 1, 1975, plaintiff advised the contracting officer that it denied responsibility for all costs relating to foundation problems, but agreed to participate in the effort to resolve the problem. In these efforts, plaintiff's representatives participated in meetings with representatives of the contracting officer and representatives of TPC. Correction procedures subsequently were agreed upon and were used in the installation of all of the pump-turbine units. The correction used installation procedures recommended or approved by BLH.

In connection with its participation in the correction of the vaned intake ring problem, BLH incurred costs which were included in a claim submitted to the contracting officer on August 27, 1975.[3]

On November 30, 1975, as part of its dissolution program, BLH paid a liquidating dividend to its shareholder in exchange for all its existing shares. On June 21, 1976, BLH filed a Certificate of Dissolution with the Delaware Secretary of State.

Pursuant to its obligations under the contract, after November 1974, BLH provided

---

**2.** 53 Comp.Gen. 124 (1973).

**3.** The original claim was for $9,960; it was amended on Apr. 18, 1977, to $10,204.

the services of an erecting engineer to supervise the erection contractor, TPC, for a period in excess of 3,000 calendar days. After June 21, 1976, BLH maintained an office in Media, Pennsylvania, solely to provide assistance relative to the contract. This office consisted of three full time employees and four temporary consultants. Defendant has compensated BLH through a series of contract modifications for the expense incurred in maintaining this office.

During the 3-year period following June 21, 1976, defendant did not make final any claim against BLH arising out of the April 1975 damage to the two upper concrete anchor piers in Unit No. 5, or for additional costs related to correction of the vaned intake ring problem. Defendant made no application to the appropriate Delaware court for an extension of the statutory winding up period following the dissolution of BLH.

On July 15, 1980, the contracting officer rendered a decision on the dispute concerned with the vaned intake ring problem. The contracting officer decided that BLH is responsible for costs of $476,900 for additional work, and for $3,750,000 for impact, delay and acceleration costs, which amounts had been paid to TPC. The decision determined that BLH is indebted to the Government in the total amount of $4,266,900 due to BLH's defective design of the pump-turbines.

Plaintiff's appeal from the decision of the contracting officer was the filing of a petition in the United States Court of Claims on July 13, 1981, pursuant to section 10(a) of the Contract Disputes Act of 1978.[4] The petition seeks a de novo proceeding on the claim involved in the contracting officer's decision, a determination that plaintiff is not liable on the Government's claim contained in the contracting officer's decision,

and judgment in the amount of $10,204 plus interest. Paragraph 4 of the petition pleads specially that it is filed "without prejudice to a right to obtain dismissal of the action, and any subsequent claims or counterclaims by defendant, for plaintiff's lack of capacity to sue or be sued." Defendant's September 25, 1981, answer counterclaims for $4,226,-900. The matter is before the court on cross-motions for summary judgment; briefing was completed on October 26, 1982; and oral argument held on March 22, 1983.[5]

## DISCUSSION

Plaintiff contends that it was dissolved as a corporate entity on June 21, 1976, and, in accordance with the law of the state of its incorporation, that it has lacked capacity to sue or be sued since June 20, 1979. Defendant contends that the contracting officer's consideration of plaintiff's August 27, 1975, claim pursuant to the disputes clause process was a proceeding that under state law continued plaintiff's existence as a body corporate for the purpose of the proceeding until any order therein is fully executed.

A private corporation is an artificial entity that is created by statute, and it can exist only under the express law of the state or sovereignty by which it was created. After dissolution, there must be some statutory authority for the prolongation of its life. The common law rule that held a corporation was dead and could not sue or be sued after dissolution,[6] has been changed in every state to permit a period during which actions by or against a corporation may be pursued notwithstanding its dissolution.

■ In all federal courts, including this court, a corporation's capacity to sue or be sued is to be determined by the law of the

---

4. 41 U.S.C. § 609(a) (Supp. II 1978).

5. At the oral argument, the parties were requested to submit by Apr. 5, 1983, supplemental briefs on three topics. Plaintiff's supplemental brief was filed Apr. 5, 1983. Defendant, after three requests for enlargement of time, on Apr. 12, 1983, was excused from filing a supplemental brief.

6. *Oklahoma Natural Gas Co. v. Oklahoma,* 273 U.S. 257, 259, 47 S.Ct. 391, 392, 71 L.Ed. 634 (1927); *Woodbury Granite Co. v. United States,* 103 Ct.Cl. 226, 230, 59 F.Supp. 150, 152 (1945).

state of incorporation.[7] In this case the relevant law is the law of Delaware. BLH was incorporated on June 24, 1965, in Delaware, and its Certificate of Dissolution was filed on June 21, 1976, with the Delaware Secretary of State.

■ Delaware, in its General Corporation Law, continues the existence of dissolved corporations for a term of 3 years, or for such longer period as the Court of Chancery may direct, for the purposes of prosecuting or defending suits and of enabling them gradually to settle and close their business, but not for the purpose of continuing the business for which the corporation was organized.[8] Unless an action or proceeding by or against the corporation is commenced either prior to or within 3 years after the date of its dissolution, a dissolved corporation has no capacity to sue or be sued.[9]

The policy objective of the Delaware statute (section 278) was to provide a compromise between two conflicting principles—protection of creditors and provision of a final termination date. A federal district court has explained the purposes of section 278 as follows:

"The first of these principles is that corporations should not be able to avoid their debts and other liabilities by dissolution. It is for this purpose, and to enable corporations to dispose of their affairs in an orderly fashion, that the three-year winding-up provision was created.

"The second principle reflected in Section 278 is that there should be a definite point in time at which a corporation is terminated.... To allow a proliferation of suits dependent upon the time which it takes a corporation to wind up its business would be unfair to the corporation and contrary to the purpose of orderly and timely dissolution. Continued prosecution of such suits would contribute to a 'continual dribble of business activity' which might prolong the winding-up process indefinitely while directors and shareholders become harder to locate and records of the corporation become stale or misplaced." [10]

BLH ceased manufacturing operations when it closed its plant on April 30, 1972, and since that time has not conducted the business for which it was organized. Defendant does not contend otherwise. All of its activities relate exclusively to the disposition of business arrangements related to the orderly liquidation of its business then pending and the completion of its obligations under this contract. Provision of the services of an erecting engineer to supervise the erecting contractor, TPC, and maintenance of a small office for the purposes of contract administration and start-up operations on the pump-turbines provided in the contract are entirely consistent with the objective of section 278. BLH's

7. FRCP 17(b) and USCCR 17(b).

8. The General Corporation Law, Del.Code Ann. Ch. 8, § 278, provides:
"§ 278. Continuation of corporation after dissolution for purposes of suit and winding up affairs
"All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of three years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities, and to distribute to their stockholders any remaining assets, but nor for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit, or proceeding begun by or against the corporation either prior to or within three years after the date of its expiration or dissolution, the corporation shall, for the purpose of such actions, suits or proceedings, be continued bodies corporate beyond the three-year period and until any judgments, orders, or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery."

9. The 3-year period also may be extended, and corporate existence for purposes of suit continued, on application within the 3-year period to the Court of Chancery, or by the appointment of a trustee or receiver by the Court of Chancery to take charge of the corporation's property.

10. *Johnson v. Helicopter & Airline Services Corp.*, 404 F.Supp. 726, 735 (D.Md.1975).

activities after its dissolution to fulfill its obligations under the contract accord with section 278's purpose "of enabling them gradually to settle and close their business, to dispose of and convey their property, and to discharge their liabilities."

The fact that BLH and the Corps of Engineers entered into a number of contract modifications after dissolution does not disqualify BLH from the provisions of section 278. Contract modifications such as here involved are normal in contract administration routines and are consistent with the winding up and settlement of a business as permitted by section 278. Courts have construed section 278 to allow dissolved corporations to continue to carry on significant activities and transactions, including: to hold substantial assets, to retain a board of directors, to hold regular meetings, to issue shareholder reports, to file state and federal tax returns, to invest corporate assets beyond the 3-year period and to contract for insurance.[11] Such activities do not extend the 3-year limitation on the corporation's existence or continue its capacity to sue or be sued in actions that have not been commenced prior to dissolution or within 3 years thereafter.

By August 17, 1971, the Corps of Engineers was aware that the manufacturing operations would be closed down, and in 1972 plaintiff requested a novation agreement with Allis-Chalmers, who would complete the manufacturing operations under the contract. Defendant refused to agree to a novation agreement and took no steps to assure that plaintiff or its parent corporation would answer for claims under the contract. Defendant did not commence an action against BLH prior to or during the 3-year period, nor did defendant apply to the Delaware Court of Chancery during the 3-year period for its extension.[12]

In accordance with the Delaware statutes, BLH was dissolved on June 21, 1976, and the statutory winding up period continued to June 20, 1979. On that date, BLH no longer had legal existence as a corporation, and no longer had the capacity to sue or be sued. When this action was filed on July 13, 1981, the 3-year winding up period had expired and plaintiff had no capacity to maintain the case.[13]

Defendant's assertion of a counterclaim in its answer on September 25, 1981, could not revitalize the defunct corporation nor have an affect on its capacity to be sued. After June 20, 1979, BLH was not a "dormant" corporation that under Delaware law could be revived;[14] it was a dead corporation without legal existence.[15] BLH was a voluntarily dissolved corporation, that, after June 20, 1979, had no de facto existence for purposes of suit by or against it. Delaware, in section 278, does not permit the 3-year winding up period to be further extended by actions of either the corporation or by outside creditors after the period has expired. The statute provides a continuation of corporate existence until judgment only for actions, suits, and proceedings that were commenced prior to the expiration of the 3-year period. It does not prolong the capacity of the corporation to sue or be sued for actions, suits or proceedings that were commenced after the 3-year period.[16]

Delaware has provided an orderly process for the fixing of a finite time at which a corporation is terminated. The legal capac-

---

11. Id. at 728.

12. BLH had disposed of all of its assets when it was dissolved on June 21, 1976. During the 3-year period, defendant could not have obtained appointment of a trustee or a receiver by the Court of Chancery pursuant to Del.Code Ann. Ch. 8, § 279, to take charge of the corporate property. *In re Citadel Industries, Inc.,* 423 A.2d 500, 507 (Del.Ch.1980).

13. *Johnson v. Helicopter & Airline Services Corp., supra* note 10; *Smith-Johnson S.S. Corp.*

*v. United States,* 231 F.Supp. 184 (D.Del.1964); *In re Citadel Industries, Inc., supra* note 12.

14. *Wax v. Riverview Cemetary Co.,* 41 Del. 424, 436, 24 A.2d 431, 436 (Super.Ct.1942).

15. *McBride v. Murphy,* 14 Del.Ch. 242, 248, 124 A. 798, 801 (1924), *aff'd,* 14 Del.Ch. 457, 130 A. 283 (1925).

16. *Johnson v. Helicopter & Airline Services Corp., supra* note 10, 404 F.Supp. at 731, n. 4 and 5.

ity of a dissolved corporation is controlled exlusively by the statute. To allow the dissolved corporation or its creditors to extend the 3-year period would destroy the statutory scheme for finality in a dissolution, and render a major part of the statute meaningless. The purpose of section 278, as in similar provisions in other states, is to assure to all interested parties that there is a definite time when the corporation ceases to exist and all claims relative to its business are terminated.[17]

Defendant asserts that the submission to the contracting officer on August 27, 1975, of a claim for an equitable adjustment for costs incurred in connection with the vaned intake ring problem started a "proceeding" that the Delaware statute allows to continue beyond the 3-year period.[18] Defendant is in error. By its terms the Delaware statute applies to "any action, suit, or proceeding" that results in "any judgments, orders, or decrees." The statute applies to administrative proceedings that are equivalent to "suits" or "actions."

Activities incident to the administration of a contract by the contracting officer, including activities involving the changes and dispute clauses, do not ripen into an administrative suit or action, for the purposes of the Delaware statute, until the contracting officer has rendered a decision, and that decision is appealed. A first principle of contract administration, from the initial submission of a claim for an equitable adjustment and until the final decision of the contracting officer pursuant to the disputes clause, is that the posture of the parties is one of negotiation and compromise. The administration of the contract during this period is not an adversary proceeding, and until the Government's position is embodied in a final decision, no "dispute" exists. Procedures pursuant to the disputes clause become a "proceeding" within the meaning of the Delaware statute, when the dispute is presented to a board of contract appeals under the contract or to a court pursuant to the Contract Disputes Act. In such proceedings both the board and the court proceed de novo, and neither is bound by the findings and conclusions of the contracting officer.[19]

Defendant, in support of its position, cites *Nager Electric* and *Schlesinger.*[20] Defendant's reliance is misplaced. Neither case stands for the proposition that an administrative proceeding begins when a request for an equitable adjustment is submitted, or during the early stages of the dispute clause procedures. In *Nager Electric,* the court was concerned with the accrual of a cause of action, for statute of limitations purposes, when disputes clause procedures were involved. The court held that the cause of action accrued upon completion of the administrative process and a decision by the Board of Contract Appeals. *Schlesinger* holds that a contractor is required to take a timely appeal from an adverse final decision of the contracting officer. The contractor was required to exhaust the administrative remedies, and administration of the contract did not become a "proceeding" until the contracting officer's final decision.

Defendant also contends that BLH is estopped from asserting its lack of capacity as an affirmative defense because BLH never informed the Government that it had filed for dissolution, and because it continuously held itself out as capable of handling all of its contractual responsibilities.

17. *MBC, Inc. v. Engel,* 119 N.H. 8, 13, 397 A.2d 636, 639 (1979); *Bishop v. Schield Bantam Co.,* 293 F.Supp. 94, 96 (N.D.Iowa 1968); *Canadian Ace Brewing Co. v. Joseph Schlitz Brewing Co.,* 629 F.2d 1183, 1189 (7th Cir.1980).

18. Defendant argues: "The process of identifying a dispute, attempting to negotiate a resolution, and the issuance of the contracting officer's final decision are all part of the administrative procedures that must be exhausted prior to the filing of an action in court to recover on a claim. An administrative proceeding begins immediately upon the existence of a dispute, regardless of the ultimate path chosen to resolve it."

19. 41 U.S.C. § 605(a) (Supp. II 1978).

20. *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847 (1966); *Schlesinger v. United States,* 181 Ct.Cl. 21, 383 F.2d 1004 (1967).

The elements required to erect an estoppel are not present in this case.[21] The facts do not establish that defendant was ignorant of the situation, or that it relied upon plaintiff's conduct to its injury. Plaintiff on July 6, 1971, publicly announced it was closing its manufacturing operations and this was known no later than August 17, 1971, by the Corps of Engineers. The 1972 negotiations relative to a novation agreement fully informed defendant that Allis-Chalmers in fact would perform under the contract, and that plaintiff had in process a dissolution program. The January 10, 1973, administrative report on the novation agreement makes it clear that defendant was aware plaintiff was in the process of dissolution as a corporation. In the circumstances, the fact that defendant was not given official notice when the Certificate of Dissolution was filed on June 21, 1976, is irrelevant.

Although defendant had notice that plaintiff was in the process of going out of business and dissolving its corporate status, it did nothing to assure that BLH continued as a viable entity for purposes of a claim. By its conduct plaintiff did not mislead defendant into a belief that it would continue indefinitely.

Defendant is the cause of its predicament. Any injury defendant has at this time is not the product of plaintiff's actions, it is the result of defendant's inaction. It did not agree to a novation with Allis-Chalmers to substitute it as the manufacturer of the pump-turbines. Defendant did not assure a timely decision by its contracting officer that would have allowed a "proceeding" recognized by Delaware statute to be commenced. Finally, defendant did not apply for an extension of the 3-year period by the Delaware Court of Chancery.

Plaintiff's contention that it lacks capacity to sue in this court is correct. Plaintiff's motion for summary judgment is allowed and its complaint will be dismissed because it lacked capacity to bring an action in this court on July 13, 1981. Defendant's cross-motion for summary judgment is denied. Defendant's counterclaim cannot be pursued in this court against plaintiff and its counterclaim will be dismissed without prejudice.

---

**21.** These elements are:
1. The party to be estopped must know the facts.
2. He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has the right to believe it is so intended.
3. The latter must be ignorant of the true facts.

4. He must rely on the former's conduct to his injury.
*California State Board of Equalization v. Coast Radio Products,* 228 F.2d 520, 525 (9th Cir. 1955); *H & M Moving Inc. v. United States,* 204 Ct.Cl. 696, 710, 499 F.2d 660, 668 (1974).