BLH, INCORPORATED, (A Dissolved Delaware Corporation) Armour and Company, and the Greyhound Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 333–84C, 352–85C.

United States Claims Court.

Sept. 15, 1987.

---

C. Stanley Dees, Washington, D.C., for plaintiff. David A. Churchill, of counsel.

Charles R. Gross, with whom were Asst. Atty. Gen., Richard K. Willard, David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case is before the court on cross-motions for summary judgment. The dispute centers upon whether the liability of a defunct corporation can be satisfied against either of its parent companies. For the reasons set forth below, the court grants Plaintiffs' Cross-Motions for Summary Judgment and accordingly, Defendant's Motion for Partial Summary Judgment is denied.

### Facts

On June 26, 1984 (No. 333–84C), and again on June 11, 1985 (No. 352–85C), plaintiffs filed their respective complaints requesting that the court rule that they have no liability under the government's claim as set forth in the contracting officer's [1] final decisions dated June 27, 1983, and June 25, 1984. In order to properly analyze this case, the court believes it is necessary to begin with a history of the dispute, starting with the precursor case, *BLH, Inc. v. United States,* 2 Cl.Ct. 463 (1983) ("BLH I").

On June 24, 1965, Baldwin-Lima-Hamilton Corporation ("Baldwin") the predecessor of plaintiff, BLH, was incorporated un-

---

1. In both of these instances, the adverse final decisions were issued by the same contracting officer, Colonel Gurnie C. Gunter, Corps of Engineers.

der the laws of the State of Delaware.[2] The Certificate of Incorporation was amended to change the name to BLH, Inc., on May 1, 1972. From June, 1965, to its dissolution on June 21, 1976, BLH was a wholly-owned subsidiary of plaintiff Armour and Company ("Armour"), which is a nonoperating corporate entity and is wholly-owned by plaintiff, The Greyhound Corporation ("Greyhound"). Greyhound is a holding company owning a number of subsidiaries engaged in various types of business activities.

On April 15, 1968, Baldwin contracted with the Army Corps of Engineers ("Corps") for the design, manufacture and delivery of six hydraulic pump-turbines for the Kaysinger Bluff Project. The project was subsequently renamed the Harry S. Truman Dam and Reservoir Project.[3] The contract price was $6,466,541. At the time of the execution of the contract, BLH was the only party to that agreement, other than the government.[4]

On July 6, 1971, Armour publicly announced that BLH's manufacturing division would be closed and its assets sold. The hydraulic turbine and valve product line was sold on October 20, 1971, and BLH notified the Corps that it would subcontract the domestic manufacturing portion of the contract to Allis-Chalmers Corporation. On April 21, 1972, domestic manufacturing performance obligations under the agreement were subcontracted to Allis Chalmers. BLH ceased all manufacturing operations on April 30, 1972.

After conferring with the Corps in June of 1972, plaintiff executed three novation agreements with respect to other contracts but failed to agree to a contract novation with the government on this contract. The reason for this is that the Corps demanded an extension of warranty conditions at no cost in exchange for the novation.[5] This was unacceptable to BLH.

The pump-turbine units were delivered to the project site between January 1, 1975, and October 21, 1975. These units consisted of several components. The installation of one such component, the vaned intake ring, was performed by the erection contractor, Truman Powerhouse Contractors, pursuant to a separate prime contract with the Corps. BLH's contract included an obligation to supervise the work of the erecting contractor.

In April of 1975, during the installation of the vaned intake ring, a crack in the foundation concrete for the ring was discovered. Consequently, the contracting officer suspended certain work involving the vaned intake ring supports pending the resolution of the problem. BLH denied liability for any costs related to the foundation concrete cracking problems but agreed to assist in remedying the problem.

Although BLH filed a Certificate of Dissolution with the Delaware Secretary of State on June 21, 1976, it continued to provide the services of an erecting engineer to supervise the erection contractor for more than 3,000 calendar days. After June 21st, BLH maintained an office solely to provide assistance to matters which concerned the contract and was compensated by way of contract modifications for expenses incurred in connection with the maintenance of that office.

The contracting officer issued the first in a series of three adverse final decisions with respect to the contract at issue here on July 15, 1980. It found that BLH was liable to the government in the amount of $4,266,900 due to its defective design of the pump-turbines. This initial claim was

---

**2.** Baldwin and a predecessor company began the manufacture of hydraulic turbines and valves prior to 1900.

**3.** The project was located on the Osage River in Missouri.

**4.** It should be noted that Greyhound did not acquire Armour until after the execution of the contract.

**5.** At plaintiff's request, the Comptroller General issued an opinion stating that the Corps could recognize a novation if it was, in its determination, in the best interest of the Government. The opinion also noted that Armour was not responsible for BLH's performance under the contract but would act as guarantor under the proposed novation. *BLH, Inc. v. United States,* 2 Cl.Ct. 463 (1983) (discussing 53 Comp.Gen. 124 (1973)).

made more than three years after the June 21st filing of the Certificate of Dissolution. Under Delaware General Corporation law, claims by or against a dissolved corporation must be brought within three years of the filing of the Certificate of Dissolution. Section 278, *Continuation of corporation after dissolution for purposes of suit and winding up affairs,* provides:

> All corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution, the corporation shall, for the purpose of such actions, suits or proceedings, be continued bodies corporate beyond the 3–year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery.

Del.Code Ann. tit. 8, § 278 (1978) (citation modified).

 This section of the Delaware Code permits the Court of Chancery at its discretion, to continue the entity's corporate existence for a period of time in excess of three years if such time is necessary to allow a corporation to complete the winding up of its affairs. *In re Citadel Industries, Inc.,* 423 A.2d 500 (Del.Ch.1980).

Thus, the claim was asserted against BLH after the statutory winding up period had expired on June 20, 1979. After that period, BLH no longer had any legal existence as a corporation and, consequently, no longer had the capacity to sue or be sued. That fact notwithstanding, BLH filed a complaint on July 13, 1981, in the United States Court of Claims, invoking one of the procedures of the Contract Disputes Act of 1978 ("CDA"). *See generally* 41 U.S.C. § 609(a) (1976 and Supp.1981).

In a clear decision by Judge Harkins in 1983, this court dismissed plaintiff's complaint and defendant's counterclaim on the basis of plaintiff's lack of capacity to sue or be sued. The opinion found that:

> Defendant is the cause of its predicament. Any injury defendant has at this time is not the product of plaintiff's actions, it is the result of defendant's inaction. It did not agree to a novation with Allis-Chalmers to substitute it as the manufacturer of pump-turbines. Defendant did not assure a timely decision by its contracting officer that would have allowed a "proceeding" recognized by Delaware statute to be commenced. Finally, defendant did not apply for an extension of the 3–year period by the Delaware Court of Chancery.

> Plaintiff's contention that it lacks capacity to sue in this court is correct.

*BLH, Inc.* 2 Cl.Ct. at 470.

### BLH II—Case Number 333–84C

Following this court's 1983 decision, however, the contracting officer rendered two additional adverse decisions against BLH. The first, dated June 27, 1983, determined that BLH was liable for various costs totalling $2,639,409 due to BLH's defective design of other parts of the pump-turbine system. That decision, however, also purported to hold Armour and Greyhound liable on the theory that BLH was acting as their agent. On June 25, 1984, just prior to the expiration of the twelve-month period for appeal under the CDA, defendant filed for summary enforcement of the contracting officer's June 27, 1983, decision against all three plaintiffs in the United States District Court for the Western District of Missouri. The following day, BLH appealed that final decision to this court. Armour and Greyhound did not file an appeal.

## BLH III—Case Number 352-85C

The second adverse final decision was issued by the contracting officer almost a year later on June 25, 1984. Although the substance of the claim was virtually identical to the decision issued on July 15, 1980, (and dismissed in *BLH I*), this time the contracting officer determined that BLH, (notwithstanding BLH's nonexistence), Armour, and Greyhound were all jointly and severally liable for the damages which arose from the vaned intake ring problem. All three entities appealed to this court by filing a second direct access complaint, No. 352-85C, on June 11, 1985. This series of legal actions seemed to mimic Mark Twain's famous response on hearing of a newspaper report of his death. "It was greatly exaggerated."

## Motions for Dismissal, Consolidation and Intervention

On November 21, 1985, this court, in a bench ruling, dealt with the peculiar legal situation created in BLH II by both parties treating BLH as an existing entity. That situation involved defendant's attempt to seek a dismissal based upon the ruling in BLH I, even though the defendant created the legal circumstances after BLH I that led to BLH II. These circumstances paradoxically involved a non-existing entity attempting to appeal a contracting officer's final decision which defendant had procured and then had sought to make nonappealable on the grounds that plaintiff did not exist. It should be noted that all three motions were intimately related. The motion to dismiss was premised on BLH I's res judicata effect. The motions for consolidation and intervention would effectively undermine the basis for defendant's Motion to Dismiss since it would change the parties from BLH I, allowing existing entities to defend the claims asserted by the defendant against them.

To allow defendant to file a contracting officer's final decision against BLH after the decision in BLH I, while refusing to allow any party to appeal that decision based upon this court's prior ruling, would make a mockery of due process. Further, since the thrust of defendant's underlying position is that Armour and Greyhound are the alter egos of BLH, to deny those parties access to one-half of the cases pending in this court in which they are named as being jointly and severably liable on this common transaction would be a manifest waste of judicial resources. The final result of a failure to grant motions for consolidation and intervention would be to have BLH III litigated in this court while the same basic controversy which is at the core of BLH II would be litigated in another court at the time the defendant tried to enforce the contracting officer's decision as final against BLH's corporate parents, Armour and Greyhound. Thus, reason, logic, fundamental fairness and the economy needed to preserve scarce judicial resources all argued in favor of granting the motions for consolidation and intervention. When such motions were granted the underlying premise of defendant's argument in its motion to dismiss ceased to exist. That motion was therefore denied.

Defendant strongly argued that consolidation and intervention should not be allowed in light of Armour and Greyhound's failure to join as plaintiffs in BLH II. However, it seems clear to the court that these plaintiffs acted appropriately at the time BLH II was filed. This is true since Armour and Greyhound were not parties to the contract and did not believe they had standing to file a complaint in their own names. In order to protect themselves, they had to use BLH, the defunct subsidiary, to appeal the government's claim. Moreover, it has always been their contention that they are not the alter egos of BLH and therefore did not believe they could or should file their own direct access appeal. To do so might, from their perspective, lend credibility to the government's argument. Thus, it is the court's finding that none of the plaintiffs failed to pursue claims in a diligent fashion.

With regard to judicial economy and efficiency, it seems clear to the court that these cases concern common issues of law and fact. This is so for all issues presented by this litigation, including: whether res judicata principles prohibit the relitigation

of issues; whether Armour and Greyhound were contractors; whether Armour and Greyhound are the alter egos of BLH; whether the government can hold Armour and Greyhound liable under an implied-in-law contract theory; or the numerous issues that would arise which are related to the pump turbine problems. The facts, issues, and witnesses would be virtually identical. Finally, the court can see no prejudice to defendant because of the identical nature of the facts and issues.

The somewhat novel and complicated procedural disputes and the force with which they have been argued reflect a long and complicated factual history. They also reflect an important trait of corporate personhood, namely, limited liability, which finds itself at odds with the current desire to find someone responsible for every wrong.

In a somewhat schizophrenic approach, defendant has argued that the ruling in *BLH I* precluded BLH from maintaining its complaint in case No. 333-84C, yet it did not preclude the government from rendering two adverse final decisions against BLH after the decision in *BLH I* was issued. The government seems to be saying that BLH was alive enough to be sued, but not enough to appeal! The court finds this position untenable and at odds with both due process and common sense.

If, in fact, plaintiff exists for the purpose of imposing liability, it must also exist with sufficient viability to defend itself in suit. The judicial process can never be one-dimensional. A system which allowed a complaint but no answer, and then awarded judgment on the basis of no answer could hardly claim the name judicial.

### Discussion

These consolidated cases are before the court on Plaintiffs' Cross-Motions for Summary Judgment and Defendant's Motion for Partial Summary Judgment. BLH bases its summary judgment motion on its incapacity to sue or be sued. Armour and Greyhound base their motions on their lack

of liability for BLH's contractual obligations. Defendant's Motion for Partial Summary Judgment seeks to resolve the issue of Armour's and Greyhound's responsibility as a result of the final decisions of the contracting officer. These motions raise novel issues as a result of the unusual factual and procedural history surrounding the case. Logically, this matter breaks down into four primary questions. Each area of inquiry shall be dealt with individually.

### I. Res Judicata

■ The first issue presented is whether under the established principles of res judicata, the ruling in *BLH I* compels this court to grant plaintiff BLH's motion for summary judgment thereby dismissing it as a party to the consolidated cases. Clearly, the answer must be yes. As of June 21, 1979, BLH ceased, in the law's contemplation, to exist. Its corporate personhood was dead. However, the government seems to contend in this case that BLH has returned from the grave, like a vampire of movie lore, and asks us to drive the metaphorical stake through plaintiff's heart. As grounds for such action, the government contends that BLH has indeed been haunting the scene, drawing sustenance from the government, and vicariously serving the interests of its living masters, Armour and Greyhound. Plaintiff BLH, speaking from the legal netherworld contends that indeed the government, in a kind of legal necromancy, has forced its return to the world of the legal living. The government has filed two final contracting officers' claims [6] against BLH and its corporate parents *after* the final decision of this court in *BLH I* declaring that BLH could not be sued. The government's issuance of the two additional final decisions, in addition to its seeking to impose liability on "the living", also has the effect of an improper attempt to relitigate the issues raised in *BLH I*. In essence, the government is attempting to accomplish through the backdoor what it cannot accomplish

---

**6.** The first of these final decisions was issued on June 27, 1983, and the direct access complaint, No. 333-84C was filed on June 26, 1984. The second, final decision, dated June 25, 1984, resulted in civil action No. 352-84C, which was filed on June 11, 1985.

through the front door. BLH does have enough existence to challenge the government's post-BLH I adverse final decisions against it which are inconsistent with the ruling in *BLH I*. Of course, the existence of BLH and consequently its capacity to defend itself, is no longer essential to this case due to this court's ruling on the earlier motions to dismiss and for intervention and consolidation.

Thus, because BLH no longer has any legal existence, and cannot therefore sue or be sued, the remaining three issues, solely concern plaintiffs Armour and Greyhound.

## II. Definition of "Contractor" Under the CDA

■ Defendant argues that Armour and Greyhound are "contractors" within the meaning of the CDA[7]. 41 U.S.C. §§ 601–613 (1982) However, since neither of these plaintiffs were signatories of the contract, which defendant concedes, they cannot be considered "contractors" as the term is usually understood. It is well-established that a party is not entitled to maintain an action against the government unless he is in privity with the United States. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983). Here, neither Armour nor Greyhound were parties to the contract or in privity with the government. This is so because the contract documents show Baldwin, the predecessor to BLH, as the sole offeror, and, the only signatories to the contract were Baldwin and a government representative. Although Baldwin acknowledged in the contract documents that it was owned by Armour, this is not sufficient to impose contractual obligations on Armour. And, of course, there is no mention of Greyhound in any portion of the contract since Greyhound did not acquire Armour until after

the contract between BLH and the government was executed.

The government further attempts to support its claim by asserting that Armour and Greyhound "became" the real parties to this contract through their corporate control of BLH and their continued performance of the contract after the dissolution of BLH. Defendant's argument fails for two reasons. First, as the court *ruled* in *BLH I*, under Delaware law, a subsidiary's post-dissolution contract modifications[8] are construed as part of its own business activities rather than those of its parents. *Id.* at 468. The public policy reason is clear, this period allows for the corporation to wind up its affairs in an orderly fashion. This inures to the benefit not only of the corporation, but also the entities engaged in business with the corporation. It allows for the distribution of corporate assets to those equitably entitled to them. *Addy v. Short*, 47 Del. 157, 89 A.2d 136 (Del.1952). Here, there has been no evidence of fraudulent or inequitable conduct which might provide a basis for piercing the corporate form of BLH. On the contrary, the reverse is true. All the facts stipulated or alleged suggest that plaintiffs acted responsibly to achieve an orderly dissolution.

Second, no evidence has been presented which demonstrates the existence of an implied-in-fact contract. Such a contract would have been necessary for there to have been privity[9] between the two remaining plaintiffs and the government. This factor is essential since a person is not entitled to sue on a contract, even though he benefits from the contract's performance, absent a showing that he is in privity with one of the parties to the contract or that he is a direct third-party beneficiary of the contract. *See Orchards v. United States*, 4. Cl.Ct. 601, 607 *aff'd on other*

---

7. The CDA defines the term "contractor" as "a party to a Government Contract other than the Government." 41 U.S.C. § 601(4) (1982).

8. The parties entered into thirteen contract modifications between July 13, 1978 and October 8, 1982.

9. Privity of contract is "that connection or relationship which exists between two or more con-

tracting parties. It was traditionally essential to the maintenance of an action on any contract that there should subsist privity between the plaintiff and defendant in respect of the matter sued on." Black's Law Dictionary, 1079 (5th ed. 1979). Thus, privity is that relationship which signifies and imposes certain obligations upon the contracting parties.

*grounds,* 749 F.2d 1571 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Privity may be established by showing either an express or implied-in-fact contract between the parties. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1550 (Fed.Cir.1983).

Since there was no express contract between Armour or Greyhound and the government, defendant must prove the existence of an implied-in-fact contract to demonstrate privity. However, defendant failed to aver any facts to reflect such an existence. For example, there is no evidence that Armour and Greyhound received benefits as a result of their dealing with the Corps. Nor is there evidence of any money which passed to Armour which was received as a result of improper use of BLH in its dealing with the Corps. Further, there was no meeting of the minds which, based upon their conduct, reflected a tacit understanding. *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923). Thus, in the absence of any contractual relationship between the remaining plaintiffs and the government, the court cannot treat Armour and Greyhound as contractors unless they were direct third-party beneficiaries of the contract.

Although shareholders are not per se excluded from being third-party beneficiaries, more than a mere shareholder relationship is required before they may initiate an action. *Orchards,* 4 Cl.Ct. at 609. There must also be a showing that the contractual parties intended to allow shareholders to have such a relationship which would allow them to maintain a legal action on the contract. *Id.* In the instant case, there are no facts which would support this basis for privity of contract and hence, liability. Based upon the foregoing reasons, the court must conclude that neither Armour, nor Greyhound, are contractors under the CDA.

### III. Corporate Alter Ego

Alternatively, defendant argues, that even if the remaining plaintiffs were not parties to an express or implied-in-fact contract, that they are alter egos of BLH, and, therefore the court is able to "pierce the corporate veil" and thus impose liability upon BLH's corporate parents. This court and its predecessor only infrequently have decided cases involving alter ego issues, and we have found no decision which is applicable to the instant facts. We therefore look for guidance to other jurisdictions, where we have found general agreement on the relevant standards and considerations.

We begin with the well established principle that "a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent corporation will not be liable for the obligations of its subsidiaries." *Tennessee Valley Authority v. Exxon Nuclear Co.,* 753 F.2d 493, 497 (6th Cir.1985) (citation omitted). A court will pierce this corporate veil only reluctantly and cautiously, *CM Corp. v. Oberer Dev. Co.,* 631 F.2d 536 (7th Cir.1980), and only upon a strong showing by the party asking it to do so. *Exxon Nuclear Co.,* 753 F.2d 493 (6th Cir.1985). Generally, the party has been required to prove three elements: complete control, fraud or injustice, and proximate causation. The Court of Appeals for the Fifth Circuit has described these elements at length:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the ... [parent corporation] to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of ... [the opposing party's] legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Berger v. Columbia Broadcasting System, Inc.*, 453 F.2d 991, 995 (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) (quoting *Lowendahl v. Baltimore & Ohio R.R. Co.*, 247 A.D. 144, 287 N.Y.S. 62, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936)).

Courts have established no fixed formula for determining whether a parent corporation has so completely dominated its subsidiary that the subsidiary has no independent existence. Rather, a variety of factors must be evaluated on a case by case basis. The Fifth Circuit has listed some of the factors which are generally recognized by the courts:

whether; (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts [and courts generally] are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.

*Miles v. American Tel. & Tel. Co.*, 703 F.2d 193, 195–96 (5th Cir.1983) (citations omitted).

The parties have stipulated to many of the facts relevant to our inquiry into the relationship between BLH and Armour and Greyhound. We find the following stipulated facts determinative of that relationship:

1) BLH maintained its own financial records, including annual balance sheets and profit and loss statements.

2) BLH contracted with the government in its own name.

3) Before and during contract performance, defendant routinely audited BLH. Defendant did not audit Armour before awarding the contract. The parties have not presented evidence which shows that defendant audited Armour during BLH's performance although the government did audit both BLH and Armour concerning the costs of the Media, Pennsylvania office.

4) While BLH's officers and board of directors included officers and members of the board of directors of Armour, they also included persons unassociated with Armour or Greyhound.

5) Armour did not guarantee BLH's performance of the contract. It would have become the guarantor if the parties had agreed to the proposed novation.

6) BLH subcontracted some of the work it was obligated to perform under the contract.

7) BLH negotiated and executed novations of its other contracts with the United States in anticipation of its liquidation.

8) The Comptroller General stated that Armour was not responsible for BLH's performance of the contract.

9) On June 20, 1979, the last day of the winding-up period, defendant met with representatives of BLH and Greyhound. They reached agreements on BLH's continuing obligations under the contract, operation of the Media office, and government funding of that office. BLH operated the office through December 1982.

10) BLH and the Corps executed thirteen contract modifications between July, 1978 and October, 1982.

11) BLH or its corporate predecessor had manufactured heavy capital

goods, including large hydraulic turbines, since 1900. Armour has never manufactured heavy equipment.

In addition, plaintiffs asserted as proposed findings of fact that BLH retained its existing management structure after June, 1965, financed its own business operations, and administered its own payroll. Defendant has not disputed these proposed findings.

Defendant's most persuasive argument is that after BLH's liquidation and subsequent dissolution, BLH had no assets and became financially dependent upon Armour. After June, 1976, defendant contends, Armour alone was making all the decisions on the contract and only Armour had any financial interest in its completion. This argument, while superficially appealing, fails upon examination.

First, no single factor, like a subsidiary's undercapitalization, is determinative in itself. To bolster its position, defendant also cites the common members of the two corporations' board of directors, the active role played by Andrew Liston, who went to work for Armour after retiring as BLH's president, the authoritative role presumably played by Armour in deciding to dissolve BLH, and BLH's status as a wholly-owned subsidiary and division of Armour.

Such evidence, even when taken together, does not constitute the strong showing required for us to pierce the corporate veil. Indeed, the concept of corporate personhood and the distinction between a parent corporation and its subsidiary would .be rendered meaningless if defendant's evidence were enough to establish complete corporate domination. Under defendant's theory, virtually whenever a parent corporation chose to dissolve its subsidiary, it would become indefinitely liable for its former subsidiary's debts and contractual obligations. Defendant argues against the very essence of limited liability which the corporate form creates.

Moreover, defendant's undercapitalization argument conflicts with the undisputed evidence before us. In support of its allegation that Armour received all sums due under the post-liquidation contract modifications, defendant merely directs us to copies of the modifications themselves. Armour is not mentioned once in these documents. BLH is listed as the offeror on each modification, and each is signed by BLH's marketing manager and the government contracting officer. Cover letters accompanying the modifications, and the modifications themselves, are addressed to BLH at its Media, Pennsylvania office. The parties have stipulated that, after June 1965, BLH maintained independent financial records, including its own annual balance sheets and profit and loss statements. Defendant has offered no proof that payments for the contract modifications were not made to BLH and included in its annual accounting.

When measured against the factors ordinarily required for a finding of corporate domination, the evidence before the court discloses the absence of any genuine issue of material fact on the question of Armour's or Greyhound's domination of BLH. Prior to April 1972, when it ceased its manufacturing operations, BLH was undeniably a viable, active corporation. Even after that date, however, it continued to perform its remaining responsibilities under the contract. Moreover, BLH repeatedly negotiated and executed agreements in its own name and conducted its own accounting and financing activities throughout the period. In the absence of any contrary proof from defendant, we find that BLH was independent of its parent corporation, in both its financial and business activities. No facts point to a course of dealing by Armour or Greyhound which would change their roles from shareholders to alter egos of BLH.

Defendant has failed to establish that Armour and Greyhound supplanted or dominated BLH. Since it has failed to prove the first element necessary to establish an alter ego relationship, we need not reach the remaining two elements, fraud or injustice and proximate causation, although the court will note that the government did not point to one scintilla of evidence to show the existence of either element. In fact, there is some evidence that BLH's conduct

was that of a responsible contractor, making various accommodations to fulfill its responsibilities to the government. There is also persuasive evidence that Armour and Greyhound also attempted to further this course, but were rebuffed by the government. Although Armour did offer in 1972 to guarantee BLH's performance of the contract as part of an effort to obtain a novation of the agreement that novation was never reached. This was due to the Corp's demand that BLH agree to extend the warranty conditions at no cost in exchange for the novation. As a result, Armour did not guarantee BLH's performance.

### IV. Implied-In-Law Contract

■ Lastly, the court turns its attention to defendant's argument that Armour and Greyhound are liable for the monies claimed by defendant as a result of an alleged implied-in-law contract with the Corps. Although this court does not generally have jurisdiction over implied-in-law contracts, *Southern States Henry Co-op. Inc. v. United States*, 4 Cl.Ct. 370, 372–73 (1984), an exception exists for counterclaims for money damages asserted by the government. 28 U.S.C. § 1503 (1982); *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946); *See Shippen v. United States*, 228 Ct.Cl. 137, 654 F.2d 45 (1981).

■ Defendant asserts that the remaining plaintiffs are liable to the government for the monies allegedly owed based upon their conduct and contact with the Corps and as a result of the benefits they reaped. In support of the proposition, defendant claims that although the Corps was initially aware of Armour's intent to dissolve BLH, it was not kept abreast of the various legal steps of the dissolution and "believed that BLH would not run away from its responsibilities under the Contract." Defendant's Motion for Partial Summary Judgment at 25.

Despite this contention, the facts before the court are to the contrary. In *BLH I*, the court determined that on July 6, 1971, Armour announced plans to close the Industrial Equipment Division of BLH and in June of 1972 BLH conferred with the Corps regarding a novation of its contract. In its ruling, the court in *BLH I* found that:

Plaintiff on July 6, 1971, publicly announced it was closing its manufacturing operations and this was known no later than August 17, 1971, by the Corps of Engineers. The 1972 negotiations relative to a novation agreement fully informed defendant that Allis-Chalmers in fact would perform under the contract, and that plaintiff had in process a dissolution program. The January 10, 1973, administrative report on the novation agreement makes it clear that defendant was aware plaintiff was in the process of dissolution as a corporation. In the circumstances, the fact that defendant was given official notice when the Certificate of Dissolution was filed on June 21, 1976, is irrelevant.

Although defendant had notice that plaintiff was in the process of going out of business and dissolving its corporate status, it did nothing to assure that BLH continued as a viable entity for purposes of a claim. By its conduct plaintiff did not mislead defendant into a belief that it would continue indefinitely.

*BLH, Inc. v. United States*, 2 Cl.Ct. at 470. Thus, this issue was previously determined and, consequently, is binding on this court. The government was aware of BLH's dissolution and continued to deal with BLH during the winding up period. If it believed it had a claim against BLH, the government should have filed its claims in the Delaware Court of Chancery. However, it chose not to do so.

■ Defendant's second basis for liability is that Armour and Greyhound received substantial benefits from this course of dealing with the Corps. Defendant bases this contention on its unsupported theory that the funds under the contract went to Armour, "Money which, *presumably*, made its way to Armour." Defendant's Motion for Partial Summary Judgment at 26 (emphasis added). There is no evidence in the record to support this allegation. Even defendant admits that the money in question "presumably made its way to Armour", not that Armour actually improperly

benefited from the dissolution process. Of course, when a corporation is dissolved its assets go somewhere, and presumably they go to the shareholders. However, this is not the kind of unjust enrichment at the heart of a contract implied-in-law. That type of transfer presupposes that resources which by legal right should have gone to someone or some entity *other than* the shareholders were improperly diverted to the shareholders.

Here there is positively no evidence of this happening. Put another way, the government is saying the unjust enrichment comes from the fact that we should win, therefore that money should have *gone to us*. This is, to say the least, begging the question. Liability cannot be based upon assumed liability. And, with regard to Greyhound, defendant fails to even proffer a theory and a set of facts which would demonstrate Greyhound's liability. To echo the words of Judge Harkins, defendant failed to seek relief in the Delaware Court of Chancery and thus denied itself any potential legal relief. Defendant, therefore, fails to prove its counterclaim based upon allegations of unjust enrichment.

### Conclusion

Based upon the foregoing reasons, the court grants Plaintiffs' Cross-Motions for Summary Judgment to the extent that defendant is not entitled to recover on its counterclaims. Defendant's Motion for Partial Summary Judgment on its Counterclaims is denied.

The Clerk is directed to dismiss the plaintiffs' complaints and to dismiss the Government's counterclaims as against all plaintiffs. Costs are awarded to the plaintiffs Armour and Greyhound.