Nicola **MAFFIA**
v.
The **UNITED STATES.**
No. 135–54.

United States Court of Claims.
July 12, 1956.

Thomas M. Gittings, Jr., Washington, D. C., Wilmurt B. Linker, New York City, Evan Howell, and King & King, Washington, D. C., on the briefs, for plaintiff.

Kathryn H. Baldwin, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

This case is before us on defendant's motion for summary judgment.

Plaintiff's petition alleges that one James J. McSweeney offered to purchase from the Office of the Foreign Liquidation Commissioner of the Department of State three tugs lying at the Island of Malta for $4,000 each, and that his offer was accepted.

Before the sale was consummated, McSweeney executed a power of attorney to one A. G. Van Wye authorizing him to act as his attorney in fact "for the purpose of effectuating an assignment of said contract" to purchase the tugs. Ten days later, Van Wye "assigned said contract to plaintiff on condition that plaintiff make payment to the Office of the Foreign Liquidation Commissioner of the sum of $10,800, being the balance due upon said contract."

Plaintiff gave notice of the assignment to the Office of Foreign Liquidation Commissioner, who advised plaintiff that upon receipt of the assignment, he would be recognized as the owner of the tugs.

The assignment was delivered to the Washington office of the Foreign Liquidation Commissioner, accompanied by plaintiff's check for the balance due on the contract. A receipt for both the check and assignment was signed by the Acting Director, Budget and Accounting Division, Office of the Foreign Liquidation Commissioner.

Thereafter, through some inadvertence, the title documents to the tugs were delivered to the original purchaser in Rome, Italy.

Litigation then ensued between plaintiff and the original purchaser, as the result of which plaintiff finally secured the title documents. This cost plaintiff $92,600, he says. For this sum he sues.

Defendant pleads Title 41, U.S.C.A. § 15, in defense. This section reads:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."

■ This section seems plainly designed to protect the United States from the assertion by parties other than the contracting party of rights under Government contracts. The contract designated the party with whom the Government had dealt, and the Government desired to be responsible to this party alone. It did not want any one else to come in and claim an interest in the emoluments to be derived therefrom. It did not want to be bothered with ascertaining whether or not they had a valid interest.

The Government of the United States is a vast organization with hundreds of thousands of agents scattered all over the world. Not infrequently, as in this case, an agent in Washington might be concerned with carrying out some part of a contract, and another agent in Paris, another part. The chance for a slip-up somewhere along the line would be greatly enhanced if the Government had to deal with more than one party. And so, Congress enacted the Act of July 17, 1862, 12 Stat. 594, section 14 of which is reproduced, as amended, in 41 U.S.C.A. § 15, quoted above.

Plaintiff was not a party to the contract for the purchase of these tugs. He acquired an interest in them only by virtue of an assignment to him of McSweeney's rights under the contract.

But this is precisely what 41 U.S.C.A. § 15 was designed to forbid.

Plaintiff seeks to escape the effect of this statute by showing that he made the final payment for the tugs, not for himself, but for McSweeney, and, consequently, McSweeney secured title to them and transferred this title to him. But this obviously does not take the transaction out of the statute. When McSweeney made the final payment, he, McSweeney, acquired the right to receive the title documents, but the contract was not fully performed until the title papers had been delivered. Plaintiff's cause of action, if he has any, arises because of the delivery of them to the original contracting party, and not to him, the assignee. The contract was not fully performed until the tugs had been delivered to the purchaser. The purchaser was prohibited by Title 41 U.S.C.A. § 15 from assigning to any one his contractual right to receive the tugs or the documents evidencing title to them.

The Acting Director of the Budget and Accounting Division of the Office of Foreign Liquidation Commissioner no doubt intended to cause the delivery to plaintiff of the title documents, but his advice to his associates in Paris of the payment to him of the balance on the purchase price by a person to whom the purchaser had assigned his interest in the tugs was overlooked, apparently, by the agent having custody of the title documents, and they were delivered to the purchaser, in accordance with the requirements of the contract, instead of to the assignee.

As a result, litigation ensued, and the assignee was put to the expense, he says, of $92,600 to recover them. He seeks to hold the Government liable for this $92,600, although it only received $12,000 for the tugs.

■ It was just this sort of situation that 41 U.S.C.A. § 15 was designed to prevent. The wisdom of Congress in passing such an Act is obvious.

However, we think defendant's motion for summary judgment should be over-

ruled. Plaintiff is out of pocket the sum of $10,800, and we were advised by counsel in open court that the defendant has not returned this money to plaintiff. Since the Government pleads the invalidity of the assignment which induced plaintiff to pay this money, it would seem that it should in good conscience return the money to plaintiff. This would put plaintiff and defendant *in statu quo ante* the assignment and the deposit of the money.

This would, of course, deprive the Government of this much of the purchase price for which it agreed to sell the tugs, but it would seem that it should look to the original purchaser for this sum, since it repudiates the assignment, in consideration of which the assignee paid it the money. Before deciding this question, however, we think we should have the full facts before us. The case is, therefore, remanded to a Commissioner for the taking of testimony.

It is so ordered.

JONES, Chief Judge, and LARA-MORE, Judge, concur.

MADDEN, Judge, delivered the following opinion:

On February 6, 1948, one McSweeney, an American living temporarily in Rome, submitted to the Paris office of the Foreign Liquidation Commissioner of the Department of State an offer to purchase from the Government three surplus tugs, then located at Malta, for $12,000. The tugs were being sold pursuant to the provisions of the Surplus Property Act of 1944, as amended, 50 U.S.C.A. Appendix, § 1611 et seq. McSweeney tendered with his offer $1,200, 10 percent of the total price offered. The proper official stationed in Europe accepted the offer on February 10, 1948, and made a contract with McSweeney under the-terms of which McSweeney was to pay the balance of $10,800 by March 10. McSweeney was not able to raise the money by March 10, and applied for an extension of time to March 25, which extension was granted.

McSweeney gave to one Van Wye a power of attorney to transfer title to the tugs. Van Wye agreed with the plaintiff that if the plaintiff would pay the balance of the purchase price of the tugs, Van Wye would transfer to the plaintiff all of McSweeney's interest in the tugs. The plaintiff, then in New York, retained one Walker, a Washington, D. C., attorney, to complete the transaction for him. He sent Walker a certified check for $10,800, payable to the Government. In his letter to Walker about the transaction, he said, *inter alia:*

"The most important thing I now want, in order to be protected, is that the Foreign Liquidation Commission agrees to turn title to me before the final papers are issued. The check is conditioned upon the above terms."

On or about March 25, 1948, Walker and Van Wye went to the office of the Acting Director of the Fiscal and Budget Division, Office of the Foreign Liquidation Commissioner, in Washington. That officer said that he was authorized to conclude the transaction on behalf of the Commissioner. When Walker requested that the documents of title to the tugs be issued in the plaintiff's name, the Acting Director pointed out to him that until the full purchase price was paid, McSweeney had no title to sell. He said that the proper procedure would be for the plaintiff to make the $10,800 payment on behalf of McSweeney; that then the title would be in McSweeney and Van Wye, holding McSweeney's power of attorney, could transfer McSweeney's title to the plaintiff, who would then be recognized by the Government as the record owner and the documents of title would be issued in the plaintiff's name.

The suggested procedure was followed meticulously. A copy of Van Wye's power of attorney, a copy of Van Wye's assignment of McSweeney's title to the plaintiff, and the plaintiff's check for $10,800 were simultaneously delivered to the Acting Director, who issued a receipt reading as follows:

"Received from Nicola Maffia certified check No. 128 drawn on Manufacturer's Trust Company, New York, in the amount of $10,800.00 payable to the Treasurer of the United States as a payment on contract W–ANL (ETO II)–4098. This payment is made on behalf of James J. McSweeney, the purchaser, who has assigned the contract to said Nicola Maffia."

On March 25 a communication was sent from Washington to the Paris office of the Foreign Liquidation Commissioner under the heading "Unclassified Routine," and saying:

"Received $10,800 from Nicola Maffia on contract (ETO II)–4098. Advise McSweeney, Rome that full payment has been made. 1044's follows."

On April 1, the Paris office sent the title documents to McSweeney in a letter which said, *inter alia:*

"Delivery of your property can be accomplished upon presentation of the original Disposal Document to Lt. Peter Gill, R. N. Office of the Commander in Chief, Med., Lascarus, Valetta, Malta."

Attachment proceedings were instituted against the tugs by an alleged assignee of McSweeney. They were placed in the custody of the court, from which custody the plaintiff was not able to extricate them until October 1952. The plaintiff had legal expenses, and charges for the care and maintenance of the tugs during these years. When they emerged from the custody of the court, the shipyard owner asserted a maritime lien for additional storage and protective charges. This lien was not lifted until 1954 by which time the tugs were unseaworthy. Because the plaintiff could not get possession of the tugs, he lost several opportunities to resell the tugs at a substantial profit.

It would be difficult to imagine a more frustrating situation than that in which the plaintiff was placed. He was specific in his instructions to his attorney and agent, Walker, that he would not pay for the property unless he got the title, in his name, directly from the Government. Walker was meticulous in arranging that that should be done. The Government's Acting Director advised, correctly I think, how it could be done. His advice was followed. The Government got $10,800, and Walker left the Government office. The Acting Director put the transaction back into routine channels; the agreement with Walker was completely disregarded; the plaintiff, for his $10,800, got no tugs, but got six years of litigation, exasperation and expense.

The Government says that its agent did not have the legal power to make the agreement which he made on its behalf. It points to section 15 of Title 41, U.S.C.A., which says:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."

I think section 15 is not applicable. The Acting Director properly appraised the situation. When the Government was paid in full, there was nothing further to be done except to allow the one who presented proper title papers to take away the ships. The Government had no further interest in the person of the one who had contracted with it. I am not willing to give section 15 a construction going beyond any possible reason for the legislation. See Chemicals Recovery Co. v. United States, 103 F.Supp. 1012, 122 Ct. Cl. 166, 193–194. This is especially true in regard to the sales of surplus property, as to which the Congress was anxious that the Government get rid of the property and get what cash it could for it. The plaintiff calls our attention to section

34. of the Surplus Property Act of 1944, which says:

"(a) The authority conferred by this Act is in addition to any authority conferred by any other law and shall not be subject to the provisions of any law inconsistent herewith. * * * "

and which, in subsection (b) of section 34 says that nothing in the act should impair or affect the provisions of a long list of named statutes, but not naming section 15, relating to the assignment of contracts, which we have quoted above. I do not find it necessary to determine what effect, if any, these provisions of the Surplus Property Act of 1944 may have had upon section 15.

From the foregoing, it is apparent that I disagree with the court's conclusion that the plaintiff acquired no right to require the Government to do what it agreed to do. The rest of the decision I do not understand.

The case comes to us upon the Government's motion for a summary judgment. Under our rules the parties have a right to a decision, on the basis of the pleadings and other papers submitted and not contradicted, as to whether, taking the pleaded facts as true, there is a cause of action. The court does not decide that question. It suggests that the ultimate decision may be that the plaintiff, who has the tugs, may also have his money back, and then, not unnaturally, declines to make final such an extraordinary decision. So it sends the case to trial.

I think that when the court is confronted, on a motion filed pursuant to our rules, with a legal question which seems difficult to a majority of the court, it should deliberate longer and make up its mind, and not put the parties to the trouble and expense of what may be a futile trial. I find it impossible, and I suppose that our commissioner who moderates the trial, and the parties and their counsel will equally find it impossible to determine what evidence would be relevant, under the court's decision. The consequence will probably be that every conceivably relevant bit of evidence will be offered.

The court says it would seem that McSweeney should repay $10,800 to the Government, if the Government is required by the court to pay that sum to the plaintiff. Considering that McSweeney got neither the tugs nor the money, and did everything that he agreed to do, that would be a noteworthy *denouement*.

If the decision means to indicate that the plaintiff is to ultimately recover $10,800, regardless of whether his losses were $1,000 or $30,000, I think it is unfair to both parties. There is no possible reason why the Government should pay the plaintiff more than he has lost. He must therefore prove his loss. And if he proves that his loss is more than $10,800, I would do for him what any court would do for any litigant. I would examine the rules of law as to what losses constitute recoverable damages, and I would give him a judgment for those losses. I would make no distinction whatever between the Government as a litigant and John Smith as a litigant. In doing so I would be realizing the ideal which caused this court to be created.

On the other hand, if I had the tentative opinion that the Government, in the instant situation, was immune, like an infant or an idiot, from responsibility for its acts, I would refrain from deciding the case until I resolved that question. I would not expend the time and funds of the court and the parties in gathering facts.

LITTLETON, Judge, concurs in the foregoing opinion of Judge MADDEN.