**JOHNSON CONTROLS WORLD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–357C.**

United States Court of Federal Claims.

June 18, 1999.

■■■■■■■■■■■■■■■■■■■■■■■■■

Dale H. Oliver, Los Angeles, CA, for plaintiff. Paul E. Pompeo, Vice President and General Counsel, Johnson Controls World Services, Inc., Cape Canaveral, FL, and Roger N. Boyd, Terry L. Albertson, and Linda S. Bruggeman, Crowell & Moring, Washington, DC, of counsel.

Terry M. Petrie and William W. Stewart, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Maj. Rebecca E. Pearson, United States Air Force Legal Services, of counsel.

### OPINION

MILLER, Judge.

This matter is under consideration for the third time as part of a continuing series of motions by plaintiff to dismiss government counterclaims for pension plan surpluses and related amounts. In its motion to dismiss, plaintiff challenges the court's jurisdiction over the Government's claims against plaintiff because plaintiff is not the "contractor" as defined by the Contract Disputes Act of 1978, 41 U.S.C.A. §§ 601–613 (West 1987 & Supp.1999), or, in the alternative, because the subject contract was never assigned or transferred to plaintiff's predecessor in interest from its parent corporation. To the extent that argument is deemed necessary, it will be deferred with respect to one issue.

### FACTS

The following facts are undisputed, unless otherwise noted. On September 17, 1977, the United States Air Force and Pan American World Airways, Inc. ("Airways"), executed Contract No. F08606–78–C–0004 (the "1978 ETR contract") for the performance of operation and maintenance services on the Eastern Test Range (the "ETR"). The Aerospace Services Division ("ASD") of Airways was responsible for the management and administration of the contract.[1] Effective January 1, 1980, Airways established a new 100%-owned subsidiary, Pan American World Services, Inc. ("PAWS"). As part of this corporate reorganization, ASD, including all of its assets associated with the performance of the 1978 ETR contract, was transferred from Airways to PAWS, and Airways acquired the shares of PAWS held by Airways executives.[2]

On March 3, 1982, Charles C. Gilbert, Vice President, ASD, PAWS, sent a letter to the Air Force explaining:

> The activities of the [ETR] Project of [Airways] have been under the internal corporate management of [PAWS], a wholly owned subsidiary of [Airways] since January 1, 1980. [PAWS] is a Florida corporation and our [ETR] Project is a segment of the [ASD] of [PAWS].
>
> We have been converting the corporate identity on each of our various contracts from [Airways] to [PAWS] and request that the [1978 ETR contract] also be changed to the new name.

On April 30, 1982, PAWS and the Air Force executed an agreement effecting "a change of corporate name on the said contract only . . ., so that rights and obligations of the Government and of the Contractor under the Contract are unaffected by said change." The agreement also indicated that the contract, as it sometimes referred to the "Contractor," would now denote PAWS di-

---

1. Item 0.1 of the Cost Accounting Standards ("CAS") Disclosure Statement for Airways' ASD, dated October 5, 1977, listed the 1978 ETR contract as one within the administration of ASD.

2. Item 8.3.0 of Airways' Corporate Office CAS Disclosure statement states, in part:

    In 1979, effective as of January 1, 1980 for purposes of this Disclosure Statement reporting and the accounting practices herein indicated, [Airways] established a new 100% owned subsidiary, [PAWS]. Legally, [PAWS] is

    a successor to Pan American Technical Services, Inc. In fact, the new subsidiary's business encompasses activities handled formerly by Pan American Technical Services, Inc.; three Pan Am divisions, namely, the Aerospace Services Division, the Metropolitan Air Facilities Division and the Airline Services Division; and the Pan Am headquarters office of Vice President—Contract Services. It is this corporate reorganization which is the basis for this Disclosure Statement revision.

rectly. Although Airways was not a signatory to this agreement, by letter dated April 23, 1982, C.J. David Davies, Vice President and Treasurer of Airways, informed the Air Force that, "notwithstanding the Agreement, dated as of April 30, 1982, between the United States of America and [PAWS] ... [Airways] agrees to remain liable to assure performance under [the 1978 ETR contract] for the duration thereof." Effective May 10, 1982, the Air Force contracting officer unilaterally executed Modification P00246 to the 1978 ETR contract. This modification recognized a change in the contracting parties from Airways to PAWS; changed the contractor name and address shown in Block 8 of the contract award document from Airways to PAWS; changed the contractor facility code in the contract award document from Airways to PAWS; stated that all correspondence with, and references to, the contractor shall utilize the PAWS name; and, finally, memorialized that, the foregoing changes notwithstanding, all terms and conditions of the 1978 ETR contract shall remain unchanged.

After the execution of Modification P00246, Mr. Gilbert, on behalf of PAWS, continued to sign modifications to the 1978 ETR contract. The Air Force and PAWS executed a follow-on Contract No. F08606-84-C-0001 (the "1984 ETR contract"), upon the close-out of the 1978 ETR contract for the continued performance of operation and maintenance services on the ETR. Airways was not a party to the 1984 ETR contract.

In September 1984 the Pan American Corporation ("Pan Am") was created as a holding company with both Airways and PAWS as subsidiaries. In May 1989 Johnson Controls, Inc. ("JCI"), purchased the stock of PAWS from Pan Am. PAWS changed its name to Johnson Control World Services, Inc. ("plaintiff"), in January 1991.

On May 15, 1990, JCI/PAWS sent a letter to the Air Force advising that all work under the 1978 ETR contract had been completed and enclosed the pertinent documents related to the close-out of the contract.[3] Among these documents were a Contractor's Release; a Contractor's Assignment of Refunds, Rebates, Credits, and Other Amounts; and a Completion Voucher Summary, detailing PAWS' final costs on the 1978 ETR contract by fiscal year. The Contractor's Release identifies PAWS as "the Contractor" and purports to release and discharge the Government "from all liabilities, obligations, claims and demands whatsoever under or arising from the [1978 ETR contract]." The release is signed by Francis Shill, Vice President—Aerospace Division, PAWS, and certified by William D. Adams, Secretary, PAWS. The Contractor's Assignment of Refunds, Rebates, Credits and Other Amounts similarly is signed and certified. In addition to these documents, JCI/PAWS also submitted to the Air Force, in connection with its subcontract with GE Government Services ("GE"), a Subcontractor's Release, a Subcontractor's Assignment of Refunds, Rebates, Credits, and Other Amounts, and a Completion Voucher Summary detailing GE's final costs by fiscal year. These documents are designated as subcontractor documents[4] and refer to the subcontract designation No. 78-0004-01, which is different from the prime contract number reserved for the 1978 ETR contract.

In September 1991 the Air Force filed a proof of claim in the United States Bankruptcy Court for the Southern District of New York in the bankruptcy proceeding of Pan Am Corporation, et al. The proof of claim asserted that Airways was indebted to the United States for amounts pursuant to both the 1978 ETR contract and the 1984 ETR contract.[5] Between November 1991 and No-

---

**3.** The letterhead on which this correspondence was drafted, signed by F. Donald J. McLamb, General Manager–Canaveral Operations, contains both the "Johnson Controls, Inc.," and "Pan Am World Services, Inc.," corporate designations.

**4.** GE utilized the same preprinted forms as PAWS; however, preceding the ";CONTRACTOR'S RELEASE," and "CONTRACTOR'S AS-

SIGNMENT OF REFUNDS, REBATES, CREDITS, AND OTHER AMOUNTS" were typed the words "SUB" on the GE forms.

**5.** The proof of claim states, in part:

[Airways] is indebted to the United States for certain amounts pursuant to the terms and conditions of [the 1978 ETR contract] and [the 1984 ETR contract]. The estimated amount of

vember 1992 plaintiff terminated and cashed out the pension plan that is the subject of this dispute, receiving a gross reversion of $49,618,599.00, as well as an additional reversion of pension plan assets for a total of $57,583.422.00.[6]

On March 5, 1997, the Air Force contracting officer issued her Final Decision and Demand for Payment in the amount of $56,115,322.00, of which $54,923,068.00 was for "noncompliance with contractual and regulatory requirements to identify and refund the pension plan surplus" in connection with the 1978 ETR contract and the 1984 ETR contract. The remaining $1,192,254.00 was based on the Air Force's claim for reversionary credits under the 1978 ETR contract, pursuant to Defense Acquisition Regulation ("DAR") clauses 15–201.1 (Composition of Total Cost) and 15–201.5 (Credits), allegedly received by plaintiff under old Airways participating insurance contracts.

On April 9, 1998, the Divisional Administrative Contracting Officer (the "DACO") issued her final decision regarding plaintiff's noncompliance with Cost Accounting Standard 413 related to its pension fund accounting on the 1978 ETR contract and the 1984 ETR contract. The DACO's decision "estimated the general dollar magnitude of the cost impact of the noncompliance to be $56,882,446," and, in addition, demanded interest on this sum in the amount of $22,883,185.00, for a total of $79,765,631.00.

On May 20, 1997, plaintiff filed its complaint in the Court of Federal Claims (the "357 action") seeking a determination that plaintiff was not liable for the claims contained in the Air Force contracting officer's final decision. Defendant's answer filed December 9, 1997, asserted a counterclaim under the 1978 ETR contract and the 1984

ETR contract in two counts. Count I sought "[t]o determine the Government's rights to its equitable share of the reversionary credits resulting from the termination of the ... pension fund under DAR 15–201.1 'Composition of Total Cost' and DAR 15–201.[5] 'Credits,'" demanding $56,960,751.00: $54,923,068.00 in pension fund assets improperly charged to the Government; $1,192,254.00 as a result of the plaintiff's failure to refund the Air Force's share of credits plaintiff received under prior Airways participating insurance contracts; and $845,429.00 that plaintiff received in additional pension rate credits from prior Airways insurance contracts that the Air Force discovered after the Air Force contracting officer issued her final decision. Count II sought to recover the same amount in pension fund assets demanded in Count I, $54,923,068.00, yet pursuant to 1978 ETR contract clause J.33, as opposed to the DAR.

On July 27, 1998, plaintiff filed its complaint in the Court of Federal Claims (the "612 action") seeking a determination that plaintiff was not liable for the claims contained in the DACO's final decision. Defendant's answer, filed November 12, 1998, contained a counterclaim under the 1978 ETR contract and the 1984 ETR contract in the amount of $79,765,631.00, plus any interest due under the Contract Disputes Act, 41 U.S.C.A. §§ 601–613 (West 1987 & Supp. 1999) (the "CDA"), relying on the same reasoning recited in the DACO's decision.

On October 6, 1998, Plaintiff's Motion To Dismiss for Lack of Subject Matter Jurisdiction was filed in the 612 action. Thereafter, plaintiff filed its Motion To Dismiss Count I of the Government's Counterclaim for Lack of Subject Matter Jurisdiction on December 23, 1998, its Motion To Dismiss for Lack of Subject Matter Jurisdiction on January 29,

this indebtedness is FORTY–SIX MILLION DOLLARS, ($46,000,000.00). The consideration of said debt is $1,312,980,000.00 paid to the debtor by the government under the terms of [the 1978 ETR contract] and [the 1984 ETR contract] for operation and maintenance of the [ETR] for the Department of the Air Force.

**6.** Plaintiff disputes this fact, averring instead "that on December 1, 1990, PAWS terminated [the pension plan] and that by November 2, 1992, JCI, as the owner of PAWS, had received a

reversion of approximately $49.6 million, nearly the entire reversion from [the pension plan]." Plf's Response to Def's Counterclaims, filed Dec. 29, 1997, ¶ 257. Regarding defendant's contention that plaintiff received a reversion of additional pension fund assets of approximately $8 million, beyond the $49.6 million, plaintiff considers such contentions to be conclusions of law and, to the extent that they may be deemed allegations of fact, denies such allegations. *Id.* ¶ 261.

1999, which is the motion that is the subject of this opinion; and its Motion for Partial Summary Judgment on February 12, 1999— all in the 357 action.

The court entered an opinion on April 28, 1999, granting plaintiff's motion to dismiss in the 612 action. *See Johnson Controls World Services, Inc. v. United States*, No. 98–612C (Fed.Cl. Apr. 28, 1999). Pursuant to that opinion, plaintiff moved to dismiss its complaint in the 612 action without prejudice, which was granted by order entered on May 6, 1999.

On May 4, 1999, the court entered an order dismissing those portions of Count I of defendant's counterclaim in the 357 action seeking recovery of $54,923,068.00 as "reversionary credits" based on DAR 15–201.1 (Compensation of Total Cost) and DAR 15–201.5 (Credits) and seeking recovery of $845,429.00 in pension rate credits from prior Airways insurance contracts. *See Johnson Controls World Services, Inc. v. United States*, 43 Fed.Cl. 589 (1999). The order specified, however, that defendant was not precluded from pursuing its rights under DAR Section 15, Part 2, to the extent that it is incorporated into clause J.33 in the 1978 ETR contract and clause H.871 in the 1984 ETR contract, to recover the same amount of surplus pension assets as a result of overbilling and overfunding of the pension plan.

In the wake of this complex, confusing, and redundant motions practice,[7] defendant's surviving counterclaims in the 357 action amount to $54,923,068.00, based on plaintiff's alleged failure to comply with clause J.33 of the 1978 ETR contract (Count II of defendant's counterclaim), and $1,192,254.00, as the result of the contractor's failure to refund the Air Force's share of credits that plaintiff allegedly received under prior Airways participating insurance contracts (the only remaining claim in Count I of defendant's counterclaim).

Plaintiff's pending motion to dismiss seeks disposition of all claims against plaintiff aris-

ing from the 1978 ETR contract. Plaintiff argues that any liability attendant to that contract cannot be imputed to plaintiff because Airways, not PAWS, is the contractor, and because the contract was never properly assigned or transferred to plaintiff, or PAWS as plaintiff's predecessor in interest. Plaintiff's Motion for Partial Summary Judgment seeks to bar any government recovery under Count I of defendant's counterclaim, or, in the alternative, limit the Government's maximum recovery to $2,607,179.69, the amount that plaintiff alleges to be "the pension costs actually charged to the Government by Plaintiff's predecessor in interest." Plf's Br. filed Feb. 12, 1999, at 1. Plaintiff also contends that clause H.871 of the 1984 ETR contract does not provide an independent basis for the adjustment of pension costs.

In its counterclaim defendant posits that "[t]he 1984 ETR Contract was a 'follow on contract' to the 1978 ETR Contract[;] consequently clause J.33 continued to operate." Def's Ans. filed Dec. 9, 1997, ¶ 275. Although the contracting officer's decision relied on clause H.871 as a basis to recover the $54,923,068.00 in pension fund assets independent of clause J.33, defendant does not rely on clause H.871 for the purposes of its counterclaim. Thus, if the instant motion to dismiss is granted, the court may be asked to determine whether clause J.33 of the 1978 ETR contract, to which plaintiff would not be bound, could still be employed by defendant to impose liability upon plaintiff based solely on defendant's contention that clause J.33 should continue to operate because the 1984 ETR contract was a follow-on to the 1978 ETR contract. If the instant motion to dismiss is denied, Count II of defendant's counterclaim based on clause J.33 would remain intact, as well as that portion of Count I seeking to recover $1,192,254.00 as the result of the contractor's failure to refund the Air Force's share of credits that plaintiff allegedly received under prior Airways participating insurance contracts.[8]

---

7. Plaintiff so informed the court in its Motion for Partial Summary Judgment, stating: "Plaintiff has moved to dismiss ... on two separate grounds in motions filed on December 22, 1998, and January 28, 1999. In the event that either of those motions is granted, this motion may be-

come moot, in whole or in part." Plf's Br. filed Feb. 12, 1999, at 2.

8. Indeed, if plaintiff does not prevail, Count II of defendant's counterclaim demanding $54,923,068.00 would also survive plaintiff's Motion for

## DISCUSSION

When evaluating a motion to dismiss for subject matter jurisdiction pursuant to RCFC 12(b)(1), the allegations of the complaint, or in this case, counterclaim, should be construed favorably to the pleader, *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), to the end that the court must accept as true the facts alleged in the complaint. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). In *W.R. Cooper General Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988), the court stated: "In cases such as this in which a party has moved to dismiss for lack of jurisdiction, we must consider the facts alleged in the [counterclaim] to be correct. If these facts reveal any possible basis on which the non-movant might prevail, the motion must be denied." (Citing *Scheuer*, 416 F.2d at 236; additional citations omitted.). However, the burden is on the non-movant to establish jurisdiction. *See Reynolds*, 846 F.2d at 748 (citing cases).

The Supreme Court has set forth standards, employed by the Federal Circuit, that are applicable to defendant's motion.

> [I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.... "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)); *see W.R. Cooper*, 843 F.2d at 1364 (citing *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683) ("If the[ ] facts [alleged in the complaint] reveal any possible basis on which the non-movant might prevail, the motion [to dismiss for lack of jurisdiction] must be denied.").

Partial Summary Judgment, because that motion does not address specifically defendant's rights to the pension fund assets pursuant to clause J.33.

"If a motion to dismiss for lack of subject matter jurisdiction ... challenges the truth of the jurisdictional facts alleged in the complaint, the ... court may consider relevant evidence in order to resolve the factual dispute...." *Reynolds*, 846 F.2d at 747 (citations omitted). The party asserting jurisdiction "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence ... [and] must be given an opportunity to be heard before dismissal is ordered." *Id.* at 748 (citations omitted).[9]

### 1. *Plaintiff as "contractor"*

In support of its contention that "Airways—not JCWS or PAWS—is the only 'contractor' under the 1978 ETR contract," Plf's Br. filed Jan. 29, 1999, at 7, plaintiff contends: (1) Plaintiff was not a signatory or party to the 1978 ETR contract; (2) it is of no legal consequence that PAWS, plaintiff's predecessor in interest, was a wholly-owned subsidiary of Airways, the party alleged by plaintiff to be the contractor; and (3) PAWS was analogous to a subcontractor under the 1978 ETR contract, which, if true, removes PAWS and any successors in interest from a claim by the United States and, therefore, from the court's subject matter jurisdiction, as well.

■ Section 601(4) of the CDA, defines the term "contractor" as "a party to a Government contract other than the Government." In general, the CDA's waiver of sovereign immunity extends only to those parties with express or implied contracts with the Government. Without a separate agreement, subcontractors and sureties will not be in privity with the Government, and thus, may not assert a claim directly against the Government. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1548–49 (Fed.Cir.1983); *Fidelity & Deposit Co. of Maryland v. United States*, 31 Fed.Cl. 540, 542 (1994) (holding performance bond surety not "contractor" within meaning of CDA); *Westech Corp. v. United States*, 20 Cl.Ct. 745,

9. The court declines defendant's invitation to treat plaintiff's motion as if it were filed pursuant to RCFC 12(c) as a motion for judgment on the pleadings.

748–51 (1990) (finding prime contractor's surety not "contractor" entitled to maintain claim under CDA); *Clean Giant, Inc. v. United States,* 19 Cl.Ct. 390, 392–93 (1990) (determining Court of Federal Claims without jurisdiction to hear subcontractor claims); *Acousti Eng'g Co. of Florida v. United States,* 15 Cl.Ct. 698, 700 (1988) (dismissing subcontractor's complaint for failure to fulfill jurisdictional requirements of CDA); *BLH, Inc. v. United States,* 13 Cl.Ct. 265, 271–72 (1987) (explaining that neither corporate parent of dissolved subsidiary that had contract with Government were contractors as defined by CDA, and thus not liable under subsidiary's contract); *cf. Ginsberg v. Austin,* 968 F.2d 1198 (Fed.Cir.1992) (deciding that for purposes of CDA landlord did not transfer claim for back pay on lease with GSA despite transfer of all rights, title, and interest in such lease).

Defendant urges the court to "reject [plaintiff's] suggestion that the relationship between Airways and PAWS as that of a typical parent-subsidiary necessitates a finding that PAWS was not a contractor within the meaning of 41 U.S.C. § 601(4)," as well as "[plaintiff's] suggestion that the relationship between Airways and PAWS was analogous to that of a prime contractor and subcontractor." Def's Br. filed Mar. 16, 1999, at 11 n.4. Defendant considers both arguments to be misleading because the cases on which plaintiff relies do not parallel the instant facts.

Plaintiff relies primarily on *BLH.* In that case, the court, after examining the definition of "contractor" under the CDA, concluded that the liability of a defunct subsidiary corporation that had entered into a contract with the Government could not be satisfied against either of the subsidiary's parent companies. The court reasoned that neither parent was in privity with the Government, that neither parent was a signatory to the subject contract, and that the subsidiary was acquired by the parent after the time of contracting. The court also noted that, under applicable state law, "a subsidiary's post-dissolution contract modifications are construed as part of its own business activities rather than those of its parents," *BLH,* 13 Cl.Ct. at

271 (footnote omitted), and that no evidence had been adduced demonstrating the existence of an implied-in-fact contract.

Plaintiff is correct that the claimant lacking privity with the Government will be precluded from directly asserting its rights under the CDA. Plaintiff, however, is not analogous to a subcontractor. The pleadings and supporting documents suggest that the transfer of ASD assets from Airways to PAWS reflected merely a corporate reorganization, rather than the establishment of a new and legally distinct corporate entity created expressly to satisfy obligations undertaken by Airways on the 1978 ETR contract. *See The Triax Co.,* 88–3 BCA ¶ 21,174 (finding joint venture formed by awardee and outside party for purpose of performing contract to be analogous to subcontractor of awardee); *Fireman's Fund/Underwater Constr., Inc.,* 87–3 BCA ¶ 20,007 (determining that third party that entered into agreement with awardee subsequent to award did not enter into contract with Government and was not "contractor" as defined by CDA). Before and after the creation of PAWS, ASD was the division responsible for contract performance. Moreover, an agreement, signed by an officer of PAWS and the Air Force contracting officer, was "entered into as of 30 April 1982 between Pan Am World Services, Inc. (a subsidiary of Pan American World Airways, Inc. and hereinafter sometimes referred to as the "Contractor") ... and the UNITED STATES OF AMERICA," in which the parties agreed that the 1978 ETR contract would be amended by "deleting therefrom the name 'Pan American World Airways, Inc.' wherever it appears in the Contract and substituting therefor the name 'Pan Am World Services, Inc.'" Following this agreement, the Air Force executed a modification changing, *inter alia,* the "contractor name" to "Pan Am World Services, Inc." Although PAWS was not an original signatory to the 1978 ETR contract, the April 30, 1982 agreement constitutes a formal expression of the parties' intent to render PAWS the "contractor" for the 1978 ETR contract; the subsequent modification achieved this end, evincing the level of privity between PAWS and the Air Force neces-

sary to render PAWS a contractor for purposes of the CDA.

Plaintiff relies on *BLH* for the proposition "[t]hat PAWS, [plaintiff's] predecessor-in-interest, was a wholly owned subsidiary of Airways does not make PAWS, or [plaintiff] for that matter, the 'contractor' under the 1978 ETR Contract." Plf's Br. filed Jan. 29, 1999, at 7. *BLH* is not helpful to plaintiff in this regard. *BLH* considered the imputation of liability from a subsidiary signatory acquired by a corporate parent after contract execution; the instant case is just the opposite, involving the imputation of liability from a parent signatory to a subsidiary incident to a corporate reorganization, in which the subject division, ASD, was in existence prior to contract execution. Plaintiff points to "the well established principle that 'a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent corporation will not be liable for the obligations of its subsidiaries.'" *BLH*, 13 Cl.Ct. at 272 (quoting *Tennessee Valley Authority v. Exxon Nuclear Co.*, 753 F.2d 493, 497 (6th Cir.1985)). Plaintiff overlooks that Modification P00246, prompted by the agreement signed by PAWS, expressly identifies plaintiff's predecessor in interest as the "contractor." Although plaintiff is correct that PAWS' status as a wholly-owned subsidiary of a contract signatory automatically does not raise PAWS to "contractor" status for the purposes of the CDA, plaintiff has not directed the court's attention to facts or law suggesting that plaintiff should be precluded from being regarded as the contractor for the 1978 ETR contract because PAWS was a wholly-owned subsidiary of Airways.

### 2. *Transfer/Assignment*

Plaintiff next contends that neither the Government nor Airways properly assigned or transferred the 1978 ETR contract to PAWS or plaintiff. According to plaintiff, (1) the Anti–Assignment Act, 41 U.S.C.A. § 15

(West Supp.1999) (the "Act"), bans the transfer of a government contract unless the Government has consented to the assignment or it was assigned by operation of law; (2) the parties never executed a novation agreement incident to any alleged transfer of the 1978 ETR contract to PAWS; and (3) the Government never implicitly recognized the transfer of the 1978 ETR contract to PAWS.[10]

▇ The Anti–Assignment Act provides, in pertinent part:

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

41 U.S.C.A. § 15. The Act's requirements "speak[ ] imperatively of annulling any Government contract which is transferred," subject to certain express exceptions. *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 10, 312 F.2d 418, 423, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). Despite this broad prohibition, the Act "has nevertheless been interpreted as being solely for the Government's own benefit and therefore as permitting the Government to assent to and recognize an assignment where it seems appropriate." *Id.* It is within the Government's discretion to waive the requirements of the Act and recognize an assignment. *See American Nat'l Bank & Trust Co. v. United States*, 23 Cl.Ct. 542, 546 (1991) ("[A]n assignment effectively binds the Government if it satisfies certain requirements of the Act, or if the Government waives those requirements and recognizes the assignment."); *see also United Int'l Investigative Serv. v. United States*, 26 Cl.Ct. 892, 898 (1992) ("*UIIS*") (explaining that Government may recognize assignment of contract "either expressly as by novation or implicitly as by ratification or waiver. In addition, transfers occurring by operation of

---

**10.** At the outset it should be noted that plaintiff recognizes that "if the government and Airways properly assigned or transferred the 1978 ETR

Contract to PAWS or [plaintiff, it would] make[ ] them in effect the 'contractor.'" Plf's Br. filed Jan. 29, 1999, at 11.

law are exempt from the [Act's] application.") Among the various methods by which the Government may recognize an assignment, "[t]he soundest and most accepted method of establishing recognition by the Government is for all three parties to enter into a novation agreement." *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 286, 614 F.2d 740, 745 (1980).

■ Past judicial interpretation of the Act leaves no doubt that it is intended for the benefit of the Government, and that it serves two primary purposes: "first, to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government; and second, to enable the United States to deal exclusively with the original claimant instead of several parties." *Monchamp Corp. v. United States*, 19 Cl.Ct. 797, 801 (1990) (citing *Spofford v. Kirk*, 97 U.S. 484, 490, 24 L.Ed. 1032 (1878), and *Patterson v. United States*, 173 Ct.Cl. 819, 823, 354 F.2d 327, 329 (1965)); *see Maffia v. United States*, 135 Ct.Cl. 604, 606, 142 F.Supp. 891, 893 (1956) (holding Anti–Assignment Act designed to protect United States from assertion of rights under government contracts by parties other than contracting party). The Act enables the Government to eliminate the "confusion of conflicting demands for payment and the chances of multiple liability." *Tuftco Corp.*, 222 Ct.Cl. at 285, 614 F.2d at 744.

■ Transfers or assignments occurring by operation of law are exempt from the Act's application. *See Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *Rel–Reeves, Inc. v. United States*, 221 Ct.Cl. 263, 273 n. 7, 606 F.2d 949, 954 n. 7 (1979); *Patterson*, 173 Ct.Cl. at 823–24, 354 F.2d at 329–30; *UIIS*, 26 Cl.Ct. at 898. Transfers by operation of law include corporate mergers, consolidations, and reorganizations. *See Tuftco Corp.*, 222 Ct.Cl. at 285, 614 F.2d at 745; *Stearns Co. v. United States*, 34 Fed.Cl. 264, 270 (1995). In *Seaboard* the Supreme Court commented:

> We cannot believe that Congress intended to discourage, hinder or obstruct the orderly merger or consolidation of corporations as the various States might authorize for the public interest. There is no probability that the United States could suffer injury in respect of outstanding claims from such union of interest and certainly the result would not be more deleterious than would follow their passing to heirs, devisees, assignees in bankruptcy, or receivers, all of which changes of ownership have been declared without the ambit of the statute.

256 U.S. at 657, 41 S.Ct. 611. The Court of Federal Claims, as the Claims Court, reached a similar conclusion when confronted with the transfer of a claim from a British corporation to a United States corporation:

> "In substance therefore there was really no transfer of the subject-matter of the claim in question, for, although the bare legal title to the claim might have passed from Kingan & Co., Limited, to the plaintiff under the deeds referred to in the facts, the equitable ownership of the claim at all times reposed in the same individuals, that is, in the hands of the same stockholders."

*Stearns Co.*, 34 Fed.Cl. at 270 (quoting *Kingan & Co. v. United States*, 71 Ct.Cl. 19, 29, 44 F.2d 447, 451 (1930)).

■ Defendant contends that "Airways' business reorganization, in which Airways transferred ASD that was performing the 1978 ETR contract to PAWS, was a transfer by operation of law outside of the proscriptions of the Anti–Assignment Act." Def's Br. filed Mar. 16, 1999, at 14. According to defendant, "[t]he facts plainly show that PAWS, which had been responsible for the management of the 1978 ETR contract before Airways' business reorganization and the April 30, 1982 Agreement, continued in the same role afterwards." *Id.*

The facts surrounding ASD's move from Airways to PAWS support defendant's position. First, the March 3, 1982 letter from Mr. Gilbert to the Air Force indicates that PAWS' request to change the contractor's name from Airways to PAWS on the 1978 ETR contract was incident merely to a change in corporate identity. Modification P00246, issued unilaterally by the Air Force

pursuant to the bilateral agreement between the Air Force and PAWS, purports to accomplish nothing more than to alter the contract to reflect this mutually recognized change. Second, ASD retained its identity as a division after the reorganization.[11] Third, it is apparent that ASD retained the same key management after its transfer to PAWS that it possessed as a division of Airways. It is undisputed that "[f]rom contract award until P00245, Charles Gilbert signed bilateral modifications between Airways and the Air Force on the 1978 ETR Contract as Vice President-[ASD], [Airways]. After the Air Force unilaterally issued P00246 ... Charles Gilbert signed bilateral modifications between the Air Force and PAWS as Vice President, [ASD], [PAWS]." Joint Stipulation of Facts filed Jan. 29, 1999, ¶ 16. Similarly, Gerald Capley served as Administrative Manager for Airways until the reorganization, after which time he served in the same capacity as Administrative Manager for PAWS. *See* Decl. of Gerald Capley, Jan. 27, 1999, ¶ 1. Fourth, the transfer of ASD from Airways to PAWS was accompanied by a transfer of all of ASD's assets and financial resources necessary to perform on the 1978 ETR contract. Plaintiff concedes as much: "Airways effected reorganization of its business operations on or about April 30, 1982, transferring assets to a separate affiliated corporation, PAWS. That transfer included all assets associated with the ETR Project segment." Plf's First Amended Compl. filed Sept. 17, 1997, ¶ 48.

These circumstances resemble closely the instances in which courts have recognized a transfer by operation of law and indicate that PAWS became the successor-in-interest to Airways for the 1978 ETR contract. This is

an awardee that voluntarily assigned its contract to a separate, distinct organization, a transfer that would be susceptible to the Act's restrictions. *See, e.g., Lane Indus., Inc. v. United States,* 142 Ct.Cl. 712, 719, 162 F.Supp. 443, 447 (1958); *NGC Inv. & Dev., Inc. v. United States,* 33 Fed.Cl. 459, 463 (1995); *Mancon Liquidating Corp.,* 74–1 BCA ¶ 10,470. Incident to the reorganization of a corporation that shifted a division responsible for contract performance from a parent to a newly created wholly-owned subsidiary, the parties in this case prudently changed the name on the subject contract to reflect the reality of the reorganization. The Air Force was never subject to multiple or duplicative obligations and was always cognizant of the contracting party. Insofar as the ASD under PAWS retained the same management and financial resources that were dedicated to the performance of the 1978 ETR contract prior to the reorganization, the Government "continue[d] to receive the benefit of the management and financial responsibility for which it bargained." *UIIS,* 26 Cl. Ct. at 899 (citing *Thompson v. Commissioner,* 205 F.2d 73, 78 (3d Cir.1953)). That Airways agreed to remain liable on the contract, notwithstanding the change-of-name agreement and Modification P00246, only underscores this point. Recognizing a transfer by operation of law under these circumstances does not impinge upon the purposes of the Act, but comports with the exception to the Act grounded in the sound policy encouraging the merger, consolidation, or reorganization of business enterprises in furtherance of the public interest.[12]

### 3. *Waiver*

Defendant asserts that "[e]ven if the court should find that a change-of-name agreement

---

**11.** After the reorganization, ASD later shortened its name to "Aerospace Division."

**12.** Plaintiff's raises the concern: "If the creation of a separate entity which then manages the operations of a contract constituted an assignment by operation of law, then a contractor could simply create a new subsidiary—which may or may not be financially capable to perform the contract—and transfer the management of that contract to the new entity, avoiding the Anti–Assignment Act." Plf's Br. filed Apr. 6, 1999, at 7. When considering whether a prohibited transfer has occurred, a court should be mindful that the Act "should not be strictly con-

strued, but applied pragmatically with a view to effectuating [its underlying] purposes." *UIIS,* 26 Cl.Ct. at 898. These purposes serve exclusively the interests of the United States. *See G.L. Christian,* 160 Cl.Ct. at 11, 312 F.2d at 423. Were the court confronted with circumstances suggesting that the assignee was not a successor-in-interest, *e.g.,* the purported successor did not retain the same management and financial resources as the predecessor, the court would be within its discretion to safeguard the interests of the United States by regarding the transfer as in violation of the Act and, thus, null and void.

was not an appropriate vehicle because the transfer did not occur by operation of law, jurisdiction is still proper. The Government waived the requirements of the Anti–Assignment Act and recognized the transfer of the contract from Airways to PAWS." Def's Br. filed Mar. 16, 1999, at 17.

■ In determining whether there is an effective waiver by the Government,

[i]t is unnecessary to identify any one particular act as constituting recognition of the assignments by the Government. It is enough to say that the totality of the circumstances presented to the court establishes the Government's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignments.

*Tuftco Corp.,* 222 Ct.Cl. at 287, 614 F.2d at 746. Thus, the Government may recognize an assignment and waive its protections under the Act in furtherance of its own interests. The required privity of contract between the assignee and the Government is present if a totality of the circumstances establishes that the Government has recognized the assignment.

■ The totality of the circumstances reflects the Air Force's understanding that, subsequent to the April 30, 1982 agreement and Modification P00246, PAWS became the "contractor" for the 1978 ETR contract. The April 30, 1982 agreement between PAWS and the Air Force deleted the name "Pan American World Airways, Inc.," from the 1978 ETR contract and substituted therefor "Pan Am World Services, Inc." Joint Stipulation of Facts filed Jan. 28, 1999, ¶ 14. The agreement defines expressly PAWS as the

"contractor." Plaintiff notes correctly that Airways was not a party to this agreement. However, in its letter to the Air Force dated April 23, 1982, Airways states:

*[N]otwithstanding* the Agreement, dated as of April 30, 1982, between the United States of America and Pan Am World Services, Inc., concerning the [1978 ETR contract], Pan American World Airways, Inc. . . . agrees to remain liable to assure performance under the above contract for the duration thereof.

(Emphasis added.) By qualifying its arrangement to remain a surety on the contract with the language, "notwithstanding the Agreement," Airways effectively recognized that PAWS was the contractor. In other words, Airways' agreement to remain liable was an additional promise to assure performance, notwithstanding the action of the parties rendering PAWS the new contractor.

Plaintiff's contention that "Airways cannot be deemed to have assigned away its rights and obligations under this contract through an Agreement to which it was not a party," Plf's Br. filed Apr. 6, 1999, at 8–9, and its incessant reliance on that language in the agreement which states that the "rights and obligations of the Government and of the Contractor under the Contract are unaffected," belie the relationship among Airways, PAWS, and the Air Force, as well as the events surrounding the transfer of ASD from Airways to PAWS. At no time after the issuance of Modification P00246, which eradicated from the contract any reference to Airways as the contractor,[13] did Airways object or conduct itself in a manner suggesting that PAWS was not the contractor.[14] Plain-

---

**13.** Plaintiff notes that the April 30, 1982 agreement between PAWS and the Air Force failed to comply with the applicable requirements of Defense Acquisition Regulation 26–403 (revised July 1, 1984), and is thus ineffective as a change-of-name agreement. Regardless of the legal effectiveness of the agreement, it has no bearing on the intent of the signatories expressed therein; moreover, Modification P00246, as opposed to the agreement, is the document of greater legal import responsible for the name change on the contract.

**14.** Contrary to plaintiff' suggestion that "there is no evidence that Airways, the contractor, ever agreed to an assignment or modification of the

contract," Plf's Br. filed Apr. 6, 1999, at 10, the April 23, 1982 letter from Airways to the Air Force; Airways' conduct subsequent to the issuance of Modification P00246; and the Air Force's overt treatment of PAWS as the contractor, *inter alia,* provide ample evidence that Airways agreed to an assignment of the contract to PAWS. *See D & H Distributing Co. v. United States,* 102 F.3d 542, 546 (Fed.Cir.1996) (recognizing that although modification of contract to include subcontractor as payee normally would require bilateral modification and signature of both parties, unilateral modification by Government sufficed because "both the contractor and the contracting officer had agreed to the modifi-

tiff's interpretation of the April 30, 1982 agreement would render Airways' letter of April 23, 1982, entirely superfluous, because, if the rights and obligations of the parties did not change as a result of the agreement, no reason existed for Airways to agree to remain a surety on a contract to which it was already bound. Defendant is correct that "the language in the Agreement, stating that the rights and obligations did not change, merely preserved the parties' rights to the same terms and conditions of the contract." Def's Br. filed Mar. 16, 1999, at 20.[15]

In *UIIS* the court rejected an argument similar to that which plaintiff advances. Under consideration was a name change agreement bearing a striking resemblance to the instant agreement: "This amendment accomplishes a change of corporate name and addresses only[,] and all rights and obligations of the government and of the Contractor under the contracts are unaffected by this change." *UIIS*, 26 Cl.Ct. at 896. The court held that, although a name change agreement was ineffective in achieving a novation, this would not preclude an effective transfer of the contract, and ultimately concluded that the transfer did not fall within the ambit of the Anti–Assignment Act. *See id.* at 898–99.

Plaintiff asserts that the unilateral actions of PAWS do not prove that Airways assigned the contract or that the Government recognized any purported assignment. In support of its contention that the contract was assigned from Airways to PAWS, defendant discusses a number of instances in which PAWS, in its dealings with the Air Force after the issuance of Modification P00246, represented both to be the prime contractor on the 1978 ETR contract. Plaintiff reprises that "[t]hese facts, however do not establish when or how Airways ever assigned the contract to PAWS. Surely the Government does not contend that an entity can become the contractor under a contract simply by repre-

senting that it is." Plf's Br. filed Apr. 6, 1999, at 11.

It is true that the mere "fact that PAWS was responsible for the management, administration and performance of the contract and dealt directly with the Air Force in its own name does not make PAWS the contractor" or achieve an assignment. *Id.* (citing *Fireman's Fund/Underwater Constr., Inc.*, 87–3 BCA¶ 20,007, and *The Triax Co.*, 88–3 BCA ¶ 21,174). However, as the court must consider the totality of the circumstances when evaluating the effectiveness of a purported assignment incident to the Government's waiver of its rights under the Anti–Assignment Act, the representations of the assignee need not be considered in a vacuum.

Defendant asserts, and plaintiff does not dispute: First, after the April 30, 1982 change-of-name agreement and Modification P00246, PAWS' personnel signed bilateral modifications to the contract between the Air Force and PAWS in the name of PAWS. Second, the confidential Descriptive Memorandum prepared for the sale of PAWS in which JCI prevailed as the buyer indicates that "[i]n 1979, the world-wide services divisions and contracts operated by [Airways] were consolidated into [PAWS]." This Memorandum's overview of the Aerospace Division states that the division's customers include "the U.S. Air Force, the U.S. Army, and NASA" and that the division's prime contractors include "Lockheed, Computer Sciences Corporation, Ford Aerospace, General Electric, and Westinghouse." Finally, PAWS submitted to the Air Force: (1) a final voucher for payment under the 1978 ETR contract; (2) a document styled "Contractor's Release," in which PAWS intended to release and discharge the Government from "all liabilities, obligations, claims and demands whatsoever under or arising from the [1978 ETR contract]"; and (3) a "Contractor's Assignment of Refunds, Rebates, Credits and Other Amounts" for the 1978 ETR contract,

cation in writing"). Airways' April 23, 1982 communication to the Air Force constituted ample written recognition of assignment of the contract to PAWS.

15. In light of the foregoing, the absence of a novation is of little consequence. Although a

novation signed by Airways, PAWS, and the Air Force may have indicated without reservation the parties' intent to substitute PAWS for Airways as the contractor, a novation is not necessary to effect an assignment. *See Tuftco Corp.*, 222 Ct.Cl. at 286, 614 F.2d at 745.

in which PAWS recognized that it is the contractor and that it has the power to assign rights to refunds, rebates, credits, and other amounts to the United States. Standing alone, these facts do not compel the conclusion that the United States waived its rights under the Act, or that Airways necessarily assigned to PAWS the 1978 ETR contract; however, considered in conjunction with, *inter alia*, the change-of-name agreement and Modification P00246, these facts bolster defendant's argument that PAWS became Airways' successor-in-interest and that the Air Force recognized PAWS to be the contractor for the 1978 ETR contract.[16]

#### 4. *Implied-in-fact contract*

Although the claimant lacking privity with the Government will be precluded from asserting directly its rights under the CDA, it is well established that agreements falling short of an express contract are sufficient to sustain a claim brought pursuant to the CDA. In particular, the CDA, as well as the Tucker Act—which defines the jurisdiction of the Court of Federal Claims—contemplate and permit the assertion of claims against the Government based on implied-in-fact contracts. *See* 28 U.S.C.A. § 1491 (West 1994 & Supp.1999); 41 U.S.C. § 602 (1994); *Eastern Trans–Waste of Maryland, Inc. v. United States*, 27 Fed.Cl. 146, 151 (1992) ("Implied-in-fact government contracts are those which, though perhaps unwritten, stem from situations showing that the usual contract requirements of a mutually intended offer and acceptance, consideration, meeting of the minds, and definiteness all existed, and an additional showing that the binding of the United States was done by an authorized official."); *Chavez v. United States*, 18 Cl.Ct. 540, 544–45 (1989) ("Implied-in-fact contracts require the same contractual elements as are required to establish an express contract, *i.e.*, mutuality of intent, offer and acceptance,

consideration, and lack of ambiguity."). In *Chavez* the court summarized concisely a case instructive on this matter, *Pacific Maritime Ass'n v. United States*, 123 Ct.Cl. 667, 675–77, 108 F.Supp. 603, 606–07 (1952):

> In *Pacific Maritime*, the government had continually accepted the labor referral services of the plaintiff, with the knowledge that the plaintiff expected to be paid, and without ever disclaiming an intention to pay. The government claimed that the plaintiff was at all times advised that any agreement with respect to compensation would have to be approved by higher officials and that approval was never actually obtained. The *Pacific Maritime* court found that an implied-in-fact contract existed because of the government's continued use of such services subsequent to the demand. The government recognized the validity of the plaintiff's claim for payment of the services, and acknowledged its obligation to pay compensation. Because the government continued to request and receive the plaintiff's services, there became an implied-in-fact contract to pay reasonable compensation. It is not the fact that a benefit was conferred that created the contract implied-in-fact, but that there was an implied-in-fact agreement to compensate the contractor for the benefit which was conferred.

*Chavez*, 18 Cl.Ct. at 545.

Defendant contends that "[b]ecause PAWS received direct payments from the Government for performance of the 1978 ETR Contract and acted as though it was the contractor under the 1978 ETR Contract, the Government should be able to recover overpayment of the contract from PAWS pursuant to an implied-in-fact agreement," regardless of whether a legal transfer of the contract occurred. Def's Br. filed Mar. 16, 1999, at 27. Plaintiff responds that

---

**16.** Plaintiff notes that the Government "filed a proof of claim in the Bankruptcy Court for the Southern District of New York asserting a claim for the surplus pension assets against Airways, again in recognition that Airways was the contractor liable under the 1978 ETR contract." Plf's Br. filed Jan. 29, 1999, at 17 n. 34. This proof of claim was for liabilities under both the 1978 ETR Contract and the 1984 ETR contract;

the United States' assertion of a claim against Airways on both contracts, particularly in light of Airways' agreement to remain liable on the 1978 ETR contract, notwithstanding PAWS' agreement with the Air Force, cannot be considered anything but the prudent and comprehensive legal representation of the United States in opposition to claims advanced against it.

a finding that an implied-in-fact contract existed between PAWS and the Air Force would contradict the April 30, 1982 agreement in which the PAWS and the Air Force expressed an intent not to alter the rights and obligations under the contract, as well as the understanding expressed in Airways' letter of April 23, 1982, to the Air Force in which it agreed to remain a surety on the contract. Plaintiff also emphasizes that "the parties' express agreement not to novate the contract making PAWS the contractor directly contradicts the purported implied agreement suggested by the Government." Plf's Br. filed Apr. 9, 1999, at 14.

In light of the conclusions drawn thus far, the court need not reach a decision regarding whether an implied-in-fact contract existed between the Air Force and PAWS; nonetheless, sufficient indication of a meeting of the minds between PAWS and the Air Force is present for defendant to withstand plaintiff's motion to dismiss. Although not an exclusive list, it is apparent that (1) PAWS did receive direct payments from the Air Force; (2) the conduct of the Air Force, from the time it entered into the change-of-name agreement, manifested an understanding that Airways was no longer the contractor and that it would transact directly with PAWS; and (3) Modification P00246 was executed by a government official with sufficient authority to bind the Government. The existence of an implied-in-fact contract in this regard would not contradict, but, rather, reinforce the conclusion that a novation was not required.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED** as follows:

1. Plaintiff's Motion To Dismiss for Lack of Subject Matter Jurisdiction is denied with respect to plaintiff's assertions that (1) plaintiff was not the contractor under the 1978 ETR contract and (2) neither the Government nor Airways assigned or transferred the 1978 ETR contract to PAWS or plaintiff.

2. To assist in the oral argument scheduled for July 9, 1999, the parties shall file a Supplemental Statement by July 2, 1999, identifying the issues outstanding related to plaintiff's pending Motion for Partial Summary Judgment.

3. Defendant shall be prepared to respond on July 9, 1999, to the arguments contained in Part III of Plaintiff's Motion To Dismiss for Lack of Subject Matter Jurisdiction under the heading, "RECOGNIZING THAT JCWS IS NOT THE 'CONTRACTOR' UNDER THE 1978 ETR CONTRACT PRODUCES A JUST RESULT," which defendant did not address in its March 16, 1999 opposition. Plaintiff's arguments in this respect will be ruled on in connection with its pending Motion for Partial Summary Judgment.